IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 21-cr-192-RM

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

1. ROBERT REGER and
2. DAVID LYTLE,

        Defendants.

_____

**REPORTER'S TRANSCRIPT**
Hearing

_____

        Proceedings before the HONORABLE RAYMOND MOORE, Judge, United States District Court for the District of Colorado, commencing at 9 a.m., on the 26th day of October, 2022, in Courtroom A601, United States Courthouse, Denver, Colorado.

**APPEARANCES**

Rachael L. Doud, U.S. Department of Justice, Civil Division, Consumer Protection Branch, 450 5th Street NW, Suite 6400, Washington, DC 20530, appearing via VTC, for the Government.
Ehren P. Reynolds, U.S. Department of Justice, Antitrust Division, Washington Criminal II Section, 450 5th Street N.W., Washington, DC 20530, appearing for the Government.
Rebecca Weber, U.S. Attorney, 1801 California Street, Suite 1600, Denver, CO 80202, appearing for the Government.


Brian Rowland Leedy, Ridley McGreevy & Winocur PC-Denver, 303 16th Street, Suite 200, Denver, CO 80202, appearing for the Defendant, Mr. Reger.
Melanie Susan Morgan, Morgan Pilate LLC, 926 Cherry Street, Kansas City, MO 64106, appearing for the Defendant, Mr. Lytle.

1          TAMMY HOFFSCHILDT, Official Reporter

2             901 19th Street, Room A251
              Denver, Colorado, 80294
3                (303) 292-1088

4      Proceedings Reported by Mechanical Stenography
          Transcription Produced via Computer
5      (In open court at 9:09 a.m.)

6          THE COURT:  Please be seated.  All right.  21-cr-192,

7  United States versus of Reger and Lytle.  Starting with the

8  government.  Somebody is in charge, who is it?

9          MR. REYNOLDS:  Good morning, Your Honor.

10  Ehren Reynolds, from the Consumer Branch of the US Department

11  of Justice.  I'm joined, on my left, by Rachel Doud and on my

12  right, Rebecca Weber, Your Honor.

13          THE COURT:  Good morning to all of you.  Let's start

14  with you, Mr. Leedy.

15          MR. LEEDY:  Your Honor, I'm here on behalf of

16  Mr. Reader, who is right in front of you.  This is Gordon

17  Mehler that you have seen via video.

18          THE COURT:  He is what?

19          MR. LEEDY:  He is here today.  I think you have seen

20  him, before, on video.

21          THE COURT:  Okay.  All right.

22          MS. MORGAN:  Good morning, Your Honor.

23  Melanie Morgan, on behalf of David Lytle, who is present in the

24  courtroom.

25          THE COURT:  All right.  Good morning to all of you,

1    each, both counsel and attorneys.  Let me start by saying I

2    have already given you a clue as to one of the issues that I

3    will have, today, and that is as I was driving in to work

4    today, I was saying to myself, *What am I forgetting*.  I could

5    not figure it out until I got to work and did that, and

6    realized, your hearing aid is not in your ear.

7            So, you may have me -- hear me say *What*, *what*, *repeat

8    it*.  Forgive me.  Just try and stay closer to the microphone.

9    What can I say; it is what it is.

10           All right.  The second thing I want to do is figure

11   out, or at least give you the list of what I consider to be the

12   motions that we're addressing today.  And then make sure that

13   we're all on the same page, because if I have missed something,

14   well, then I will deal with that later, but I'm not going to

15   pretend if I missed something, that I didn't and then try and

16   adjust on the fly.

17           On Friday, I'm dealing with the third-party matter, as

18   well as the motion to clawback, which is related to the

19   third-party matter.  Today, I see myself as addressing **49, 57,**

20   **83, 74, 75, 148, 149** and **150**, and I think that that's all that

21   is out there.  Put another way, the Motion To Dismiss For

22   Prosecutorial Misconduct -- this is not in the same order,

23   okay.  The Motion To Dismiss, The Motion To Strike Surplusage,

24   The Motion For A Bill Of Particulars, The Motion To Compel

25   Discovery, The Motion With Respect To 404(b), and the two slash

1    one *James* motions.  I think there is a public one and private

2    one.  I have got two numbers on it, but it's only one motion.

3          So, let me just see if there's anything else that the

4    parties can point to, admittedly, off the top of your head,

5    that you are prepared for, that I'm not?

6          *MS. DOUD:*  Your Honor, those were all of the motions

7    that were filed.

8          *THE COURT:*  Mr. Leedy?

9          *MR. LEEDY:*  Agreed, Your Honor.  I think that defense

10   counsel and perhaps the government would like to address the

11   most recent submission by the government, as well, which you

12   got a copy of.  It's a letter, but that is not a motion.

13         *THE COURT:*  And then, Ms. Morgan?

14         *MS. MORGAN:*  What else can I say, Judge?

15         *THE COURT:*  All right.  That will work.  Okay.  I

16   don't know where the right time is to address this other

17   letter, maybe at the end of these proceedings, or if there's a

18   better spot, you can tell me.

19         *MS. MORGAN:*  Can I make a suggestion, Judge?

20         *THE COURT:*  Yeah.

21         *MS. MORGAN:*  With respect to that letter.  On behalf

22   of Mr. Lytle, we believe that that letter impacts the motion on

23   prosecutorial misconduct that we filed on behalf of Mr. Leedy.

24   So our position would be we would like to table the Motion To

25   To Dismiss Based On Prosecutorial Misconduct, until we've had

1    an opportunity to get into the weeds on the full extent of that

2    impact.  In discussing this with the government, last night,

3    they have advised that they have a fix for that letter, and

4    that would be a Superseding Indictment, and so they have

5    indicated that that is in the works, and we can expect that

6    shortly.

7         Since a misconduct motion really deals with -- with

8    the conduct that occurred in front of the grand jury, and with

9    respect to achieving an Indictment, I guess I see two issues;

10   one, we have been provided new information that says that the

11   person that testified, testified about something inaccurately.

12   So I would like to supplement the motion that exists.  That

13   could all become moot, if they actually do get their

14   Superseding Indictment, because then we have a new Indictment,

15   that will either cure everything or we will reraise it.  Just

16   to throw a wrench into today's plans.

17        *THE COURT:*  Let me just do one thing and that is take

18   two minutes.  I think the letter that we're talking about, I

19   left in chambers, and I just want to go get it.

20        *MS. MORGAN:*  Sure.

21        *THE COURT:*  Don't even move, don't even get up.  I

22   will be back.

23        (Judge left the bench momentarily.)

24        (Judge returned to the bench.)

25        *THE COURT:*  All right.  And of course I couldn't put

1    my hands on it, and didn't want to spend a great deal of time.

2    I do recall seeing the letter and reading through it and

3    saying, *Okay.  We will see what the position of the parties is*,

4    and I will find it.  Here's my only --

5            *MR. LEEDY:*  Would you like a copy of it?

6            *THE COURT:*  Yeah, that would help.  I don't have a

7    problem -- Cathy, why don't you just go make a physical copy

8    while I'm dealing with this?

9            *THE COURTROOM DEPUTY:*  Yes, sir.

10           *THE COURT:*  I don't have a problem with what

11   Ms. Morgan proposes.  So I'm going to pass, at this time, on

12   ruling on the Motion To Dismiss For Prosecutorial Misconduct.

13   I smiled at you, Ms. Morgan, because what I was thinking was if

14   they get a Superseding Indictment, that's going to solve the

15   problem.  You are not going to file a motion to dismiss.  I

16   don't believe that for a minute anymore than you do, but it

17   makes a great record, and I don't have a problem with that, and

18   what I mean by that is, even though you are going to defer it,

19   I will give you the benefit of my thoughts, now, so that you

20   can have the benefit of those thoughts in connection with

21   whatever supplement you file or substitute that you file.

22           The comment on the case being transferred from one

23   grand jury to another is interesting.  I'm familiar with the

24   process.  It's been decade and decades and decades, but I have

25   actually done it, back in the early 80s, and all of the

1   evidence and the testimony is brought into the new -- thank

2   you, Cathy.

3            *THE COURTROOM DEPUTY:*  You are welcome.

4            *THE COURT:*  -- is brought into the new room and is

5   available for the grand jury and they examine it, as much or as

6   little as they choose to examine it, and so to mention that to

7   me really doesn't get my gears going in any way.  I'm not more

8   inclined to draw inferences from that than I am from a petit

9   jury returning a verdict in an hour, when there's, you know, a

10  hundred exhibits, what did they look at?  I don't know.  One of

11  the things that I think is my reaction to this motion, and you

12  are going to hear it multiple times today, because the reaction

13  I have to many of the motions is that I feel like I'm hearing

14  or deciding the same motion, cast in different contexts, and

15  stripping away the venire, and looking at the core of what it

16  is that I'm being asked to do is I'm being asked to say, *Hey,*

17  *Judge, they think that this is some conspiracy and fraud*.  *This*

18  *was our job, and all we were doing, was doing was our job*.

19  *From our position it's somebody else's role to finalize, sign*

20  *up, review, dot the I, cross the T.  We were doing what we*

21  *always do.  So we're not guilty*.  *So, make us -- declare us to*

22  *be not guilty by granting a ...* fill in the blank, *Motion To*

23  *Dismiss For Prosecutorial Misconduct, Motion To Dismiss; don't*

24  *allow the James,* et cetera, et cetera, and there's a sense that

25  I have that it's not so much misconduct as disagreement,

because there's no obligation, in front of a grand jury, to put on a defendant's theory. I understand the response to that, and I am not trying to argue the point with you. The response to that is, it's not a theory, when they cast it in a certain light and miscast it, it's misconduct. I understand what you are saying. I'm just saying that my immediate reaction to it is that I'm being asked to take these two universe -- separate universes of thought; this is fraud versus this is just my job and decide one of them at an earlier stage of the proceeding than in front of the jury. And, you know, if the law requires that, then I will pull the trigger on that, but that's, sort of, what I see here and that's, sort of, why I fully expect there to be a refiled motion, because I don't really expect that there's going to be a great deal of satisfaction with a Superseding Indictment, but we will see, and I am not trying to tell you guys what to do or to say to you, *That if you do it this way that way or the other way I'm going to be good with it.* I'm just saying, *This seems to be the theme that travels throughout all of these motions*, and it is what it is.

So I -- I do understand that the record is that there, at least on the basis of Mr. Reynold's statement, there's an error, and they are going to try to fix it and we will see what happens. I'm not trying to convince you of anything so much, except as to give you the benefit of where I will be pushing back against you. You can do with that what you will; push

1    back.  I'm not suggesting back down, but you can continue to

2    push or reshape as you see fit.

3            All right.  Just to be clear, Cathy, **ECF Number 57** is

4    deferred until such time as the superseding indictment is filed

5    and a motion, either a supplement or a new motion to dismiss

6    for prosecutorial misconduct is filed.

7            Just so that we have some life, I'm trying to figure

8    out what that means.  What I would like to do is put some kind

9    of a timeframe on things, but by the same token I'm aware of

10   the fact that what Ms. Morgan is going to want to do, she is

11   going to want to see the testimony, which means there's going

12   to be transcripts prepared and all of the rest of it.  So I

13   don't want to sit down and say something that's not reasonable,

14   in light of the way these things have to develop.

15           What do you think?

16           *MS. MORGAN:*  I can say this, it's really important to

17   my client, and I know also to Mr. Reger to hold onto this

18   January trial date, and so I know the Court is going to need

19   enough time to, you know, hear the motion and make a decision

20   about it.

21           So my intent is, as soon as they can, you know do

22   their thing in front of the grand jury and get me information,

23   I intend to turn -- I don't want to say like it's going to be a

24   week later, but my intent is to turn it around super fast,

25   because we are not looking to delay this.

1      THE COURT:  Okay.  All right.  And again, I'm not

2  going to ask you when the grand jury meets, but I'm not going

3  to be happy, within eve of trial, a superseding.  Let's get it

4  done as soon as we can.

5      All right.  So that's **Number 57**.  Let's move over to,

6  then, **Number 49** which may or may not be in the same posture.

7  It's a Motion To Dismiss The Indictment.  It's not predicated

8  on an allegation of misconduct.  It's predicated on allegations

9  that the Indictment is confusing, and hops around whatever

10  legal significance that is, we will see, that it lacks probable

11  cause as to mens rea, and then there's some concern that

12  Mr. Kessler testified, that there was no training provided and

13  again, the thrust of this is that I should reach out into all

14  of these various things that are available to the parties and

15  dismiss this Indictment because of these deficiencies.  They

16  may be cured, as well, but I just as soon deal with them now.

17      So, I think this is yours, Mr. Leedy.

18      MR. LEEDY:  It is, Your Honor, and I can say, perhaps

19  to a lesser extent, some of the arguments made in our Motion To

20  Dismiss could be affected by the Superseding Indictment and

21  testimony, because it is, kind of, in line with what we're

22  arguing, with regard to fraudulent mail pieces and to whom they

23  were sent, who had knowledge of them, and who caused data to be

24  sold on the basis of those fraudulent mail pieces, and I think

25  we have, in the government's letter, regarding RDD and Quantum,

1    is a reflection of that confusion; it's not on the defendant's

2    level; it's on the government's level and presentation to the

3    grand jury.  They simply said a fraudulent mail piece was

4    attribute to RDD, when it was attributable to Quantum.  The

5    difficulty in the delineation there, is what we have tried to

6    make clear in our pleadings, Your Honor.  The difficulty in

7    what we've made clear in the Motion To Dismiss, but also

8    subsequent motions, including, maybe, most relevant, the Bill

9    of Particulars, what mail are we talking about and who had

10   knowledge of when?  The grand jury testimony, to be fixed,

11   Your Honor, I think will address exactly that, at the time that

12   the postal inspector testified, believed it belonged to a

13   certain fraud scheme.  I believe he is going to testify

14   differently, that that mail piece belonged to a different fraud

15   scheme, and whether that is just simply confusion or based on

16   subsequent information received by the postal inspector or a

17   mistake in presentation to the grand jury, I don't know yet.  I

18   have not seen the testimony, but that is in line with arguments

19   that we've made in relation to what we believe are key facts of

20   this, which are the actual fraudulent mail pieces that were

21   received by these alleged victims, and what knowledge, if any,

22   from my motions purposes, Mr. Reger had, of those.

23        So I think it could affect it.  And it's in the

24   beginning of my motion, it is, I think, mentioned throughout

25   the motion, Your Honor.  What we have said is that what the

1    government relied upon, getting the Indictment, was -- well,

2    lacked constitutional sufficiency to allow Mr. Reger to present

3    a defense.  For instance, the example in the Indictment related

4    to DRC, Destiny Research Center, names no creative fraudulent

5    mail piece.  It has a description of that, that is vague, at

6    best.

7            That description, is now -- well, in the Indictment it

8    it is said to happen some time in 2010, however, we know from

9    the *James* log that description has come to be in a,

10   potentially, broader timeframe between '08 and 2010, but it was

11   in a conversation that Mr. Kessler said he had with Mr. Reger

12   about an exam of a Destiny Research mail piece.

13           The testimony that Mr. Kessler gave was different than

14   what was alleged to have been discussed, as per the Indictment,

15   which was some sort of fraudulent mail piece related to

16   astrology.  Mr. Kessler recalls a smashed up car, and good luck

17   with some ring, but we are left to guess, because nothing was

18   presented to the grand jury, with regard to that mail piece

19   that was the subject of that conversation that Mr. Kessler had

20   with Mr. Reger.  We don't have it.

21           Similarly, the government relies on the sales log

22   entry that Mr. Lytle made in a personal sales force account, an

23   account to which Mr. Reger -- there's no evidence or evidence

24   presented to the grand jury that Mr. Reger didn't access.

25           They utilized that to establish what they thought was

probable cause for these offenses, because Mr. Lytle, in that

entry, referred to somebody as a designated convict.  We know

from Inspector Forde's testimony, that that was a personal

sales log entry; not distributed email; not discussed with

Mr. Reger; something within Mr. Lytle's own sales force,

electronic data base, essentially.  The emails relied upon by

the government, most of which don't involve Mr. Reger.

        In October of 2015, Mr. Lytle emailed Mr. Kessler

about an FTC civil proceeding, an Epsilon client named in that.

And in October of 2015 again he emailed Mr. Kessler about a

client's business partner that had been scared off by United

States and AGs.  Those emails don't go to Mr. Reger.  They were

not attributable to him.  There was no grand jury testimony --

        THE COURT:  So what are you asking me to do?  What I

mean by that is, I have got an Indictment that, frankly, seems

sufficient, on its face, to me.  There may be things about it

that you prefer be a little different.  There may be things

about it that could be, perhaps, more precise, but what it

sounds like you are asking me to do is take the Indictment,

just kind of put it to the side, and step in and treat the

entire grand jury process, similarly to the way that I would

treat a search warrant, by putting my own eyes on it and

deciding whether or not, in my view, there was probable cause

or not for each of these.  I don't think that's my role here.

        I have got a grand jury that's looked at the evidence,

1    that has returned an Indictment.  The language of the

2    Indictment is -- we can talk about, momentarily, but I don't

3    see these deficiencies in the language that you speak to.

4    There are ... it's in the language of the charge.  It does

5    state the necessary elements.  It identifies the charges that

6    you have to defend against.  While there may be some discussion

7    as to whether you need or don't need some additional

8    information, it's not as if there's not notice given in the

9    Indictment.  It's not as if you would be exposed to double

10   jeopardy.

11          It's more like, as I said earlier, you are looking for

12   me to take the -- all of the grand jury testimony, and kind of

13   weigh it and go this is good enough, that's not good enough,

14   therefore, there's not enough probable cause, therefore the

15   Indictment should be dismissed, and I don't ... I'm not

16   tracking that, other than at the dismissal stage there's some

17   ... there's some authority, in *Hall*, to kind of look to

18   undisputed facts and take those into account in deciding

19   whether or not dismissal is appropriate, but I don't think *Hall*

20   expands out into where there is -- from where it sits now,

21   which is there's, if you would, a confined, singular fact that

22   both sides agree upon to what you are asking me to do, which is

23   take their evidence, put your interpretation on it and then

24   say, *Well now, see this interpretation is an undisputed fact*

25   *that I should use.*  I mean, I'm taking on the role of a jury

1   when I do something like that; and that's not my job.  Not only

2   is it not my job, it's something that I should not be doing.

3       The biggest problem in this case, that I can point to

4   the same thing and draw two different inferences from it.  I

5   can point to recruiting of X and say, *That's my job, to go --*

6   *that's my business development; that's what I do.  I go and I*

7   *find clients that can engage in business with a company.*

8       Then I look to the government and they say, well,

9   you -- and I know the word *signed up* is a hotly contested issue

10  here, but, *You signed up so and so, but, you knew what they*

11  *were doing was putting out mailers, and you knew this because,*

12  *this division was basically telling its employees to go out and*

13  *get anybody and everybody under the sun, and we just weren't*

14  *going to care.  We will leave it to somebody else to see what's*

15  *going on, but we knew that the business that they were engaged*

16  *in was fraud.*

17      These are different spins, interpretations of the same

18  piece of evidence.  I see you as asking me to take this

19  Indictment and dismiss it, because it's confusing and because

20  the way you interpret it means you win.  I don't think that

21  that's the -- the role that I have, on a motion to dismiss an

22  Indictment, but I will listen to you.

23      *MR. LEEDY:*  Well, I think -- I think it can be a role,

24  and I think you are right, with regard to the basis being --

25  beginning with *Hall*, where the Court is allowed to consider

1    factual issues, and the *Brown* case, that we cited, allows the

2    Court to consider the factual predicate to an Indictment where

3    there's undisputed factual statements.  Facts that the Court

4    can consider that the government does not dispute.  This was

5    the gist of the reply to the response -- the government's

6    response to my motion, which requested an evidentiary hearing

7    on this, because what was presented to the Court, on my motion

8    to dismiss, was the government's evidence.  The government's

9    evidence presented to a grand jury --

10            *THE COURT:*  With your interpretation on top of it.

11            *MR. LEEDY:*  Well, I'm not sure that the Court has to

12   get to an interpretation to determine whether somebody received

13   an email or not; that's a grand jury exhibit; that's directly

14   on point with the October 2015 emails that the government

15   utilized to establish probable cause or knowledge on behalf of

16   Mr. Reger.  Emails he didn't receive.  That wasn't addressed in

17   the grand jury.  There wasn't any questioning with regard to

18   whether or not he got those emails in another fashion; that's

19   undisputed.  Those emails were sent to a limited number of

20   people, was on the emails, those were exhibits to the grand

21   jury, that's the information that they had, that's not disputed

22   here.  So, they utilized that to establish knowledge on the

23   part of Mr. Reger, based on statements in the press releases

24   and also statements in emails that he didn't receive.  The same

25   thing is true for the sales force entries of Mr. Lytle's.  The

1    government did not dispute that that was an internal statement

2    by Mr. Lytle that was not shared with others; Inspector Forde

3    said that and that's attached to the Motion To Dismiss; that

4    was his testimony.  He was asked about it by the government.

5    So this is not disputed evidence, Your Honor.

6         What we have talked about thus far, the sales log

7    entry, the October 15 emails, that is not disputed evidence,

8    and as the Court knows, based on the procedure they have in

9    front of the grand jury, they had every opportunity to provide

10   information to the grand jury, to ask questions, ask follow-up

11   questions.  They chose to present the best evidence they could

12   to that grand jury, and they did, and the information that you

13   have is theirs and they own it, at this point.

14        What we see, in their response, is a request for the

15   Court not to consider those facts; not to consider what was

16   presented to the grand jury; not to consider what witnesses

17   said about certain communications, and that was their evidence

18   to begin with, and it's their evidence now.  So I think through

19   *Hall* and *Brown*, the Court can consider exactly that, and

20   interpretations may exist, Your Honor, not on the very simple

21   issues that I addressed in the Motion To Dismiss, Your Honor.

22   This is not a motion, based on, you know, a lack of training or

23   resources at Epsilon, which Mr. Reger didn't receive any.  This

24   is a motion presented on what was presented to the grand jury

25   over the course of multiple days, several witnesses, including

1    government witnesses and Epsilon employees, where they had

2    every opportunity to present what they had, follow-up questions

3    about it, and what we have is what's attached to this Motion To

4    Dismiss.  So that, I believe, those are undisputed facts,

5    Your Honor.  We didn't have a chance to Cross those witnesses.

6    We couldn't present evidence on behalf of Mr. Reger.  The

7    government did.  They are stuck with it.  And I think in this

8    context, Your Honor, the Court can look to that, to determine

9    what is undisputed.

10        I don't know what is disputed, based on the

11   government's response to my motion; that's why we filed a

12   reply, requesting a hearing.  If there was a disputed issue as

13   to the evidence I attached to the Motion To Dismiss, I think

14   that's something that the Court should hear; but that has not

15   been articulated.  We don't know what that is.  We don't know

16   what testimony or what exhibit they believe is disputed, at

17   this point, but what I provided the Court, is exactly what they

18   provided to the grand jury.

19        THE COURT:  I'm assuming, Ms. Doud, since you are the

20   one that's been moving around, while he has been talking, that

21   you are the one that I should be speaking to?

22        MS. DOUD:  Yes, Your Honor.  I think Your Honor hit

23   the nail on the head as far as ... so, the concerns that

24   Your Honor raised with this motion are precisely the concerns

25   that we have, and so I won't, you know, go over all of those

1       again.  But in effect, even though this is described as a

2       Motion To Dismiss, based on the sufficiency of the Indictment,

3       it's really a Motion to Dismiss based on the sufficiency of the

4       evidence, though that evidence is not all the evidence that

5       would be presented at trial.  So the evidentiary -- evidentiary

6       hearing that Mr. Reger is requesting is, in effect, a trial,

7       but limited to what was before the grand jury, and then, with

8       the Court, rather than the jury as the decider of fact, which

9       is not proper.  So we would just stand by what was in our

10      filings and what Your Honor said.

11          THE COURT:  Why don't we have some answer to

12      Mr. Leedy's concern that, you know, these are, quote/unquote,

13      undisputed facts.

14          MS. DOUD:  What he is calling undisputed facts are a

15      small selection of the facts as a whole, and I think as

16      Your Honor was suggesting, *Hall* does provide a limited

17      exception to the general rule that the Indictment should be

18      evaluated only on its face, but that -- you can tell from those

19      cases, that that exception is extremely narrow.  It applies

20      where there's a discrete issue that, sort of, makes or breaks

21      the case, and that's certainly not the case here.  It's really,

22      a question of weighing all of the evidence, and there will be,

23      as I mentioned, evidence at trial that is not necessarily what

24      was presented to the grand jury, and certainly not -- it's not

25      limited to the specific facts that were directly called out in

1   the Indictment.

2        So it is not a question of, there's one fact that

3   showed that Mr. Reger could not have committed the offense.

4   It's a question of defense counsel saying, *Okay, well here are*

5   *specific facts mentioned in the Indictment, if you only have*

6   *those, we do not think that those are sufficient*.  It's not --

7   but again, even if the Court were to reach that, it's still a

8   question of weighing those facts.  It's not that there's one

9   specific thing that, as a legal matter, is insufficient to

10  establish the offense.

11       *THE COURT:*  I will give you the last word, Mr. Leedy.

12       *MR. LEEDY:*  Thank you, Your Honor.  And I will clarify

13  the request for hearing.  Hearing -- the hearing I would

14  request is a hearing on the disputed facts, that need not be

15  evidentiary.  We have the facts that were presented to the

16  grand jury.  I just need to know which ones we attached to our

17  motion that they dispute.

18       Here is what I hope to be the crux of the allegation

19  and the deficiencies in the Indictment.  It charges Mr. Reger

20  with knowledging deceptive nature of mail operations of three

21  clients, DRC, JKS and NCD.  It doesn't establish that Mr. Reger

22  had knowledge of the nature of the mail of those clients.  The

23  DRC example involves testimony by Fritz Kessler that doesn't

24  present a fraudulent mail piece from anyone.  A description

25  that doesn't match his previous statement about what it was

1    about.  With with regard to JKS, Your Honor, it alleges that

2    Mr. Lytke assisted JKS, on becoming an Epsilon client in

3    October of 2016, and that JKS' representative was the mailer,

4    who Mr. Lytle said used the designated convict in his private

5    sales log entry, and that Mr. Lytle emailed Kessler and others

6    a copy of JKS's mail case.  Mr. Reger was not on the email that

7    contained the fraudulent mail piece from JKS.

8          With regard to NCD, National Consumer Division,

9    Mr. Reger had left Epsilon before NCD's operations were the

10   subject of the 2017 email.  He was out of Epsilon as of

11   February 2017; everything specified in the Indictment is after

12   that.

13         Three clients that were fraudulent mailers, sending

14   some sort of fraudulent mail, an allegation that Mr. Reger had

15   knowledge of that fraudulent mail, and a failure to show what

16   knowledge, if any, he had of those mail pieces, or even what

17   they were.  We know he didn't see the sales log entry, he

18   didn't get the email by JKS, and the description of the DRC

19   mail piece, which was never presented to the grand jury, was

20   vague.

21         THE COURT:  All right.  Let me just put it to you this

22   way, within the four corners of the Indictment, what is there

23   that is deficient?  Not -- not reaching up -- using it as the

24   cover of the box and lifting it up and looking at all of the

25   grand jury.  Is there any challenge to the Indictment as

1    charged?

2        MR. LEEDY:  Yes.  I believe it lacks constitutional

3    sufficiency needed to amount a defense and those last examples

4    I just gave, gives you an example of why I think that.

5        THE COURT:  Notwithstanding the fact that you're

6    articulating the defense right now?

7        MR. LEEDY:  I'm not -- what I can articulate is the

8    actual allegation.  He had knowledge of what deceptive mail

9    piece?  That's what the government has failed to plead in the

10   Indictment.  It failed to show, during the grand jury

11   proceedings, what those were, and its failed to tell us what it

12   disputes, in our factual assertions, stating exactly that.

13       THE COURT:  The Motion To Dismiss is denied.  I -- I

14   understand the concerns, but my comment at the beginning of

15   this hearing is as true -- is as directed to this motion as to

16   anything else; and that is this, there's a dispute that is

17   between the parties as to whether or not business conduct is

18   just business conducts or whether or not business conduct, in

19   the context of a scenario, where there's a lot of things going

20   on that are alleged to be questionable, whether that -- those

21   other things can be, if you would, a circumstantial basis for

22   inferring knowledge and intent and all of these other things.

23   That's what this trial is going to, ultimately, be about.

24       To the extent that this Indictment is being challenged

25   as confusing, it says what it says, and there's no point at

1    which anyone is identifying, to me, a deficiency in the

2    allegations -- well, in the language of the indictment as

3    returned by the grand jury.  For example, one of the things

4    that was said is that there's not evidence of interdependence,

5    and, of course, when you get to the allegation of Count 1,

6    it -- the grand jury returned an Indictment saying they acted

7    interdependently.

8           I interpret this, despite the way it's been cast to

9    me, as asking me to weigh the evidence that the grand jury

10   used, and I am not going to do that, and I don't think that

11   *Hall* stands for the proposition of I get an entree to always

12   weigh whether or not the evidence constitutes probable cause,

13   because the government introduced that evidence, that therefore

14   that turns it into undisputed evidence, and therefore it brings

15   us within the framework of *Hall*, because if that is the logic,

16   then in every single case, I can go and look at the grand jury

17   evidence, and second-guess the grand jury, but with regard to

18   witnesses that I did not see, make credibility determinations

19   that are not mine to make, and to decide, on the basis of the

20   evidence presented whether or not to return the Indictment.

21   That does not mean that there are not circumstances where the

22   complete absence of any evidence in support of a claim would

23   not and could not be addressed, but I don't think that this is

24   it.

25          I think this is more argument and debate, and

1    disagreement, about what was going on in the business, and what

2    the -- the -- the general beliefs, knowledge and understanding

3    was, and to parse it out piece-by-piece and say, *Well, there's*

4    *nothing directly, with regard to this, or there's nothing*

5    *directly, with regard to that*; that's for the jury.  And so, I

6    understand, I think this Indictment is sufficient on its face.

7    I think that it satisfies the elements.  I think it gives fair

8    notice.  I think it prevents double jeopardy, and to the extent

9    that I'm being asked to do these other things, I don't think

10   it's the type of discrete fact, or the sharp issue that was

11   presented in *Hall*.  I think it is really a request for me to,

12   essentially, take bits and pieces of evidence, and then draw

13   inferences from it, divorced from all other evidence.  In other

14   words, for me to do the role of the jury, and I am not going to

15   do it.  The motion it is denied.

16        *MR. LEEDY:*  Your Honor, I apologize, I will just --

17   you don't have to respond to this, but I -- I failed to address

18   an argument made in our motion that is outside of the scope of

19   what the Court just ruled on.

20        *THE COURT:*  Go ahead.

21        *MR. LEEDY:*  Thank you.  Your Honor, this has to do

22   with the argument that we made in the Motion To Dismiss, that

23   the Indictment fails to state an agreement to violate the law;

24   specifically, based on precedent found in Supreme Court's

25   ruling in *Falcone* and *Van Huss*.  In the government's response

1    to our Motion To Dismiss, there's a footnote that addresses

2    those two arguments, but we don't think they have fully

3    addressed this, and to be -- to get to the point, Your Honor,

4    the allegation is that Mr. Reger caused Epsilon to sell

5    consumer lists to mailers he knew were engaged in mail fraud.

6    We don't believe that establishes a conspiracy to commit wire

7    or mail fraud.

8            The fact that these consumer lists were lawfully sold

9    to others, who were known to make unlawful use of them, is not

10   enough to establish the conspiracy; that's what the Supreme

11   Court ruled in *Falcone*.  It's not enough that an accused does

12   not forego, normally, lawful activity; such as, selling

13   consumer data, of the fruits he knows -- which he knows others

14   will make an unlawful use.  He must, in some sense, promote

15   their venture himself.

16           What the government has alleged here, Your Honor, is

17   the lawful sale of consumer data to individuals they allege

18   were engaged in mail fraud.  Epsilon is not alleged to have

19   engaged in mail fraud.  Mr. Reger is not alleged to engage in

20   mail fraud.  The conspiracy can't rest on the lawful conduct of

21   Mr. Reger, or any other employee of Epsilon, because other

22   individuals are using the resources they get from Epsilon in an

23   unlawful way.

24           *THE COURT:*  So, just to take it outside of the

25   business universe, if I'm a gun seller and somebody comes up,

1    and says, *Hey, sell me a gun, because I want to go shoot up the*

2    *King Soopers down the street, right now.*  *So, can can you give*

3    *me a gun*, *I will pay you extra or I will pay you the amount*.

4    Whatever the negotiation is, is whatever the negotiation is.

5    Forget about whether or not the government can prevail on that,

6    but you are saying they can't even charge the conspiracy in

7    that circumstance?

8           *MR. LEEDY:*  Um --

9           *THE COURT:*  Because that's really the way I'm

10    interpreting this.  At least ... what you are, ultimately,

11    saying to me is, if it is a legitimate business, there's

12    nothing of legitimate -- the activities of the legitimate

13    business, and its customers, cannot be fraudulent; that the

14    supplier can close his eyes, and go, *Do whatever the hell you*

15    *want with it*.  You know, *Shoot up the King Soopers.*  *Shoot up*

16    *whatever you want; just don't shoot me*, and I want to get back

17    out of the analogy, but basically say, the fact that I know

18    that they are using -- and I am not making any such finding,

19    but the fact that I know that they are using this information,

20    that we're giving them to defraud victims, whether they be old

21    people, young people, dumb people, whatever, I know what

22    they're doing, I'm going to give them the means of doing it,

23    that that can't be charged as a conspiracy, because it's the

24    business?  I don't accept that.  I grant you that that is the

25    core debate about this case, that's what the jury is going to,

1     ultimately, end up having to decide, and I am not suggesting to

2     you that the position is bad.

3          What I'm suggesting to you is that you're telling me

4     that if I can raise up the -- on the flag pole, a flag that

5     says, *This is the business of the company*, that that is a

6     protection against any claim of fraud, and I don't think it is.

7          *MR. LEEDY:* Um, I think what I attempted to articulate

8     was that you can't become a member of a conspiracy through

9     sales or otherwise, unless you know of the conspiracy and join

10    the conspiracy.

11         *THE COURT:* I agree with all of that.

12         *MR. LEEDY:* The lawful activity that you are

13    conducting, even if you know that somebody is going to go ahead

14    and utilize whatever you provided them, to, you know, a

15    criminal result, does not mean you have joined their

16    conspiracy, that's --

17         *THE COURT:* That's the debate, isn't it? It might; it

18    might. It might be that I see a common interest, and I decide

19    to, without, you know, drafting up a contract, agree with you,

20    that we're going to engage in this; and it might not be. But

21    that's what I mean by this whole -- the feeling I get

22    throughout all of this is that I'm being asked to decide the

23    question that results in the guilty/not guilty. As opposed --

24    that I'm stepping way ahead in time to that role.

25         I don't see this as a failure of this Indictment. To

1    say to me that this is a business and business activity, and

2    simply doing business activity is not enough.  I mean, look, if

3    the allegation is they knowingly devised and intended to devise

4    a scheme to defraud and obtain money by means of materially

5    false and fraudulent pretenses, representations and promises,

6    and with respect to the conspiracy, then they conspired to do

7    so, they can either prove it or they can't.  But it's not on

8    me, at this juncture, to sit down and create some kind of

9    immunity by saying, *If I find this to be the business of the*

10   *company, then there's a deficiency in the Indictment, because*

11   *they have to do something more*.  I don't know what the

12   *something more* is.  That they have to be acting outside of the

13   scope of the business?  I don't agree with that.

14        I'm not saying that they're guilty.  I'm not saying

15   that I even think they're guilty.  I'm just saying, this is

16   where the battle line is drawn, and you are asking me to come

17   along and move the battle line, and say, *No, no, you win*

18   *without -- before you start*, and I am not going to do that.  So

19   I understand what you are saying.  I maintain my position, the

20   motion is denied.

21       *MR. LEEDY:*  Thank you, Your Honor.  **One-fifty**, the

22   surplusage.  If I can jump ahead here ... at the end of the

23   day, I'm not sure what this is trying to do, but I will hear

24   from -- from counsel.

25        *MR. LEEDY:*  Your Honor, I think that what I can fairly

1    say, is --

2         THE COURT:  I mean, look, clearly, there has to be

3    some issue of it being unnecessary and prejudicial, and nobody

4    is denying that.  I don't think you or the government are

5    disagreeing about what gets to be declared as surplusage, but

6    what concerns me is that you are trying to take out adjectives

7    or qualifiers and, essentially, rewrite this.  And what I mean

8    by that is, I understand the degree of disturbance with an

9    allegation that, *Well, they usually did this* or *They frequently*

10   *did that*.  I also think that, to be blunt about it, what you

11   are trying to get me to do, is back into something where I'm

12   going to feel a sharp object stab me in my hindquarters.

13        Now, whether or not you are holding the handle end of

14   that sharp object.

15        MR. LEEDY:  No, that would be somebody else.

16        THE COURT:  That would be somebody else?

17        MR. LEEDY:  Yeah.

18        THE COURT:  And what I mean by that is, you know,

19   where I go through this Indictment and I start peeling out

20   *frequently* or *occasionally* or *sometimes* or words to that

21   effect, what I'm left with is *always*; not stated that way, but

22   essentially, if I pulled it out, that's what I'm left with, and

23   then the argument is, *Look at this, they allege that this*

24   *happened and it didn't happen here, didn't happen there, didn't*

25   *happen over there*.

1          I'm changing -- it's not that I'm striking surplusage.

2    I'm changing the tone, the flavor, the thing that the grand

3    jury indicted on; that's my concern with part of it.

4          In terms of the *elderly people* and things like that,

5    look, I just don't think that that's sufficiently prejudicial

6    to where it merits being struck as surplusage.  Especially when

7    I already know that some of the evidence -- evidence is going

8    to come in on this particular point, regardless of whether it's

9    there or not there.  I think the DOJ, whatever it was,

10   announcement, contained similar language.  So... what, it's too

11   prejudicial to be in the Indictment but it's not too

12   prejudicial to come in on the evidence?  What am I doing here?

13         *MR. LEEDY:*  That's interesting.

14         *THE COURT:*  I know shouldn't come in either place,

15   right?

16         *MR. LEEDY:*  I want to go back to where you left off

17   with which was, wasn't it in the DOJ's press release, and the

18   question is, *which one*.  And about *what actions and were they*

19   *criminal or civil*?  So, that's a problem we will get into when

20   we go down explaining what that means, associated with millions

21   of American consumers, means a whole lot of things.  And

22   whether or not that was something that the grand jury decided,

23   whether or not they were asked, whether or not this was a

24   associated with millions of American consumers, and that meant

25   whether they associated Mr. Reger's alleged conspiracy to

1    commit mail and wire fraud, that was associated with millions

2    of American consumers, is unknown, and this is clearly

3    prejudicial, Your Honor, unless they are going to prove that

4    fact.

5         So, the Court makes a good point with regard to

6    whether or not the government is going to present that and how.

7    But, clearly, the millions of American consumers is prejudicial

8    because, guess what, it's a whole lot more than the number of

9    alleged victims listed in the Indictment.

10        THE COURT:  So what?  I could have as conspiracy to

11   defraud a gazillion people, and have one count, one subsequent

12   count; it doesn't make the conspiracy prejudicial.  It just

13   doesn't.

14        I mean, you are almost now saying to me that in order

15   for this not to be prejudicial, I have to have, I don't know,

16   a-million-count case?  Or they have to prove up each -- it's

17   too much.

18        MR. LEEDY:  Well, I know they are not going to do

19   that.  It's not what you have to do.  You simply have to strike

20   surplusage, as we requested.  It's not going through and

21   redlining this Indictment, Your Honor.  It's relatively

22   conservative here; *routinely among others*; *routinely* appears

23   twice*; among others*, is once.  *Routinely*, simply expands the

24   scope of what, through their work in the DTC --

25        THE COURT:  There's no surplusage.  It's your

1    interpretation of what you want the case to be.

2            MR. LEEDY:  This is --

3            THE COURT:  You want the word *routinely* out and then

4    what does it mean, thereafter?  That they always do this?

5            MR. LEEDY:  It means through their work with the DTC,

6    Reger and Lytle, that one or more co-conspirators caused

7    Epsilon to sell target lists of consumers and their addresses

8    to clients, to the defendants; that's what it means; that's

9    what *routinely* pulled out means.

10           THE COURT:  Always.  Always.  Right?

11           MR. LEEDY:  *Among others*.

12           THE COURT:  I mean *always*.  I'm not being facetious.

13   I mean, what I'm saying to you is, to me, surplusage is

14   something that doesn't affect the remainder of the Indictment.

15   It doesn't -- things like a nickname.  All right.  I strike the

16   guy's nickname because it's, I don't know, you know, *Killer*,

17   *Doomsday*, or to quote a particular wrapper idiot, *DEFCON*, you

18   know, it doesn't change the charge.  The other charge is -- the

19   language of it, the proof of it, it's all the same.

20           When you are coming in and saying, *I want to remove*

21   *particular adjectives, adverbs or other phrases*, and it looks,

22   to me, like it's changes the meaning of the Indictment, that's

23   not surplusage; that's editing it, so it can work to your

24   favor, and I don't think that's my job either.

25           MR. LEEDY:  On the other side of that, Your Honor, I

1     think what *routinely* means, in this case is*, They did it all*

2     *the time*.  We've alleged it, in this specific instance, in the

3     Indictment, but *routinely they did it all the time*.  They don't

4     tell you about that, because that's a word in there that makes

5     it clear; but it was all the time.

6         For instance, these mail pieces, including the

7     following types, that they then go into, *among others*; that we

8     don't have to tell you about right now.  They are out there,

9     too; be on notice.

10         *THE COURT:*  All right.

11         *MR. LEEDY:*  That is what, I think, a rational jury

12     would take away from those words, and that's what, I think, do

13     not effect what the Indictment seeks to charge.  Those are

14     prejudicial.  Those do not give any weight to the actual

15     allegations established in the Indictment, and I think they

16     should be stricken.

17         *THE COURT:*  All right.

18         *THE COURT:*  Couple of things; number one, obviously,

19     you can tell that when I -- that I tend to kind of talk to

20     counsel.  I want to hear more than attaboy from you.

21         *MS. DOUD:*  So, Your Honor, I think --

22         *THE COURT:*  And I mean -- don't read into that

23     anything beyond what I said.  I don't mean it that I'm -- I

24     think you are pandering or anything else.  I want to hear the

25     government's view, independent of what I said.

1          *MS. DOUD:* Okay. So, Your Honor, as our response

2     says, and Your Honor stated, language cannot be struck unless

3     it is unnecessary or prejudicial, and the language here is both

4     necessary and not prejudicial. It's part of the case, on the

5     way the case is indicted. You know, I think there are slightly

6     different arguments for different words that they have tried to

7     strike. The *routinely* language, signals that this was a

8     regular practice, and that is a common type of charge, in the

9     context of a conspiracy, and the manner and means are, you

10     know, described as, you know, certain things routinely happen

11     or regularly happen, and there's nothing improper about that.

12          As far as the efforts to strike language, such as

13     *among others*, and *examples*, those terms are necessary to

14     understand the Indictment as reflecting what is charged,

15     because those are examples, which, again, is proper in the

16     manner and means section of the conspiracy.

17          The specific clients that are directly discussed in

18     the Indictment are not the only fraudulent claims. The

19     specific types of mailings are not the only ones, and the

20     Indictment cannot go through every single piece of evidence

21     regarding every single client.

22          We think those terms are essential and were they to be

23     struck, it would materially change what is charged and,

24     potentially, confuse, the jury.

25          And then I guess finally, as to regarding *associated*

1   *with millions of American consumers and many of those were*

2   *elderly or otherwise vulnerable*, this is something that the

3   evidence, at trial, will speak to, and it does relate to the

4   conspiracy, as a whole, and is, of course, is not limited to

5   the specific enumerated mail and wire fraud counts.

6          THE COURT:  Mr. Leedy, I don't want to make it sound

7   like I just like to chew on your leg, only, and not on

8   government counsel's leg.  The difficulty I have is I just see

9   this as -- I don't see it as surplusage.  I don't see it as

10   anything that is unnecessary.  I don't see it as prejudicial,

11   in any event.  I think it is consistent with what the evidence

12   is going to show.  I don't buy the notion that the jury is

13   going to be confused, if they pull it out, but I do think that

14   I'm being asked to needlessly edit a document for reasons that

15   are, at best, unclear, and at worst, recasts the Indictment in

16   a way that changes the Indictment, to where it enables the

17   defendant to argue, you know, *Hey, the Indictment says that*

18   *they were always doing this* or *They were always doing that*,

19   or...  I just don't think it's surplusage, I don't think it's

20   prejudicial and the motion is denied.

21          The Bill of Particulars, which is -- I'm sorry, Cathy,

22   that's **150**.

23          Okay.  The Bill of Particulars, is **148**.  I don't know

24   that anyone is a fan of Bill of Particulars, other than defense

25   counsel.  All that I mean by that is not something bad.  You

1    always want to know more.  It's always in your client's

2    interest to have things as tied down and bolted down as

3    possible.  What I have got here is a scenario, and this -- this

4    is just kind of lead in, so you can understand what my thinking

5    is to where there's been -- there is an Indictment, there is

6    a -- that includes grand jury testimony, that's all been

7    available to you.  It includes an enormous amount of evidence.

8    It's not as if the government is, kind of, hiding the ball;

9    although, I recognize that what you are going to say is, *needle*

10   *in haystack*, and not only do you have the Indictment and the

11   discovery, now you have also got the explanation that we will

12   get to later, in the *James* proffer, and that's an enormous

13   amount of information that should enable you to prepare a

14   defense.

15        I -- I don't know what it is that is here, but I will

16   let you try and convince me as to whatever particular there is.

17   What it is that you are looking for, by way of a particular.

18        *MR. LEEDY:*  Um ... we intend to make those clear,

19   Your Honor, and I do -- I will, I guess, confirm the Court's

20   projected response; there's just a ridiculous amount of

21   discovery in this case, and to search effectively is difficult.

22        Perhaps, some of that is, you know, represented by

23   what the Court has received most recently, the government's

24   submission of the letter related to RDD.  Creative examples are

25   out there, some differ a lot, some don't differ at all, but

getting, I guess, specifically, to the particular five we requested, that is the request for identification of mail pieces received by individuals identified in Counts 20 through 28. Those individuals are alleged to have sent checks, mailed in a response to solicitation, sent by Registered Disbursement Division, RDD. Clearly, I think what the Court can understand is an Epsilon employee's contact with a representative of RDD, be it broker or otherwise, will be at issue. An Epsilon employee's knowledge of a solicitation, that is attributable to RDD, will be at issue.

We know that, in the grand jury presentation, a creative or a mailer that was attributed by RDD, was not actually RDD's creative; it was a Quantum creative. The request here goes to the heart of exactly that issue, identifying what the individuals that were alleged to be victims of that deceptive mailer, what they responded to. What mail they received. They sent a check in, in response to a mailer; that's clear. What mailer it was, we don't know.

We know that the government dealt with RDD mailers, in the presentation to the grand jury, however, that resulted in inaccurate testimony to the grand jury, and it didn't belong to RDD. So if it is not an RDD mailer, it belongs to somebody else, that is relevant to something that we should know in order to present a defense.

With regard to the *James* log, I can tell you that,

1    although there's a lot -- there are a lot of entries under **46**,

2    by my count four are RDD related.  So, within the *James* log,

3    there's not a whole lot of correspondence that are directly

4    related to that particular fraudulent mailer, as alleged by the

5    government.  So we get some information -- for the Court's

6    information, those entries occur between February of 2016 and

7    September of 2016, so a relatively small timeframe within a

8    decade-long conspiracy, and do not involve Mr. Reger as the

9    entries have identified.  We will get into that later, but that

10   is particular five, Your Honor.  I started with that one,

11   because it had to do with RDD, which is something that we

12   discussed today.

13           To go back to one through four, Your Honor, this is

14   identification of clients or brokers with whom Mr. Reger and

15   Mr. Lytle are alleged to have conspired.

16           *THE COURT:*  You have that, don't you?

17           *MR. LEEDY:*  Well, if you look at the Indictment, it's

18   three clients.  If you look at the *James* log, they are add

19   clients, I think five or six more there.  So, per the

20   Indictment, I don't.

21           *THE COURT:*  Come on, I mean -- how -- how common is it

22   it for an Indictment to read, *Joey, Sally, Sue, and others,*

23   *both known and unknown to the grand jury*?  How common is that?

24   My answer is, *Every-single-day common*.  The notion that that --

25   that standard language means that an Indictment is insufficient

1    or requires a Bill of Particulars, when you have got full

2    discovery, and you just want them to articulate, in a Bill of

3    Particulars, making it the... essential equivalent of

4    arguing -- of articulating it in the Indictment, every single

5    fact.

6        It's -- it's -- it's like I said before, what you are

7    trying to do here, through all of these various things, is nail

8    them down into something specific to where you can say they

9    can't prove it all the time, every time, this case ... it's way

10   beyond what a Bill of Particulars is designed to do.

11       I mean, look, I grant you that data dumps are

12   difficult, but I grant you that it's also the case that it's a

13   damned if you do and a damned if you don't.  They've got the

14   information, they are giving you the information that they

15   have, to the extent that we can say that, you know, this is one

16   of the disadvantages of technology, it's true.  But one of the

17   advantages of technology is that there are sophisticated search

18   engines that you can use to run, I don't know, your client's

19   name, any creative name, any number of things.  You can create

20   whatever search you want, and you also have the benefit of your

21   client.

22       So, I'm sitting here looking saying, *You have got all*

23   *of the discovery*, *you have got a James -- an Indictment, you*

24   *have got a James log, that fleshes out the description of the*

25   *conspiracy, and what it is that the government is trying to*

*prove, and you are telling me no, no, I need them to tell me*

*... who responded with what.* I mean its ... I think this goes

way beyond what's necessary to prepare a defense.

     *MR. LEEDY:* Your Honor, I think it's well within Rule

7. I think the purpose of this motion as the rule states, is

to inform the defendants here of charges against him with

sufficient precision to allow them to prepare defenses and

minimize surprise at trial. Certainly, the Court can take into

consideration the complexity of the offense charged, and the

clarity of the Indictment available of discovery of the

defendant, with regard to this ruling. Here, we don't have a

Marry, Sally, Joe conspiracy that lasted over six months to

sell cocaine. We have a decade-long conspiracy that involved

countless number of people, mailers that were unidentified,

depending when we are talking about. So, it's not that case,

and this is the case where this will help minimize surprise at

trial. These are also not difficult questions.

     At this point, what's been identified, are three

individual mailers in the Indictment, followed by five or six

additional in the *James* log. And the request is, are they, and

maybe it's all of them, are those the exchanges with whom

Mr. Lytle and Mr. Reader are alleged to have conspired, and who

are the brokers and that's a relatively short list.

     It's not information that's unavailable, but the

volume of discovery is more of a problem than it is an aid, at

1    this point, because of the complexity of the Indictment, quite

2    frankly, how, I believe, unclear it is.

3         So that request, Your Honor, I think it well within

4    the provisions of Rule 7, and I think the type of case that

5    this is, supports that request.

6         Specifically, in addition to DRC, JKS and NCD, named

7    in the Indictment which puts Mr. Lytle and Mr. Reader on

8    notice, that they are alleged to have conspired with those

9    entities.  The proffer names, six additional clients BDK, RDD,

10   Palm Beach Liquidation Gallery, Nature Plus, JLDS and three

11   other services.

12        We know that RDD, there was an issue with the grand

13   jury.  RDD's fraudulent mail might have been Quantum's.  They

14   are not listed in the *James* proffer motion, and that

15   information, I believe, is readily available to the government.

16   It's not as though we're asking for anything but something

17   that's going to minimize surprise and will help allow us to

18   prepare a defense.

19        I think it's clear, on its face, why we're looking for

20   that information, Your Honor.  This is not something that we're

21   utilizing to, you know, I guess, gain some sort of unfair

22   advantage.  It's something that is clear in the request, and I

23   think the authority is clear why we should get it.

24        *THE COURT:*  Look, I don't dispute what the authority

25   is.  I don't think, you know, that there's any dispute between

1    the parties as to what the authority is.  It -- are you

2    sufficiently apprized of the charges to enable you to prepare

3    for trial?  All I hear is, *I want this detail, I want that*

4    *detail, I want the other detail*.  In other words, *I want a*

5    *script of the the government's trial presentation now.*

6          You know what the charges are.  You got discovery.

7    You -- if you don't know what the charge is, I do.  I also know

8    what the defense is.  Now, I'm not going to be -- I'm not

9    trying to be too precise about that, but I mean it's obvious to

10   both sides what this is about.  I grant you that the -- the

11   period of time involved makes it much more difficult to deal

12   with than something that went on for three days and involved

13   two meetings and, you know, a car -- a drive across state

14   lines.  I grant you that.  But I also grant you that you had --

15   that you have an enormous amount of time to go through the

16   enormous amount of discovery, that you have got -- you seem to,

17   clearly, have an understanding of what the case is, because

18   every time that we have a discussion, it's not *I don't know*

19   *what the case is*; it's *I don't know what the proof is*; that's

20   really what the issue is.  It's never been understood by me,

21   that you are saying*, I don't know what wire fraud is.  I don't*

22   *know what -- what the charged mailing is, on -- that is the*

23   *Count 1 charge of mailing or the Count 2 charge of mailing or*

24   *the Count 3 charge of mailing.*  It's, *I don't know, um ... how*

25   *they're going to prove it or I don't know what this other*

1    *stuff -- how much other stuff is going to come in.*  It's --

2    it's a discussion of trying to set walls around the evidence

3    that will come in at trial, at a date, way before the parties

4    are prepared to go to trial.

5            I don't misunderstand what you are saying.  I'm just

6    saying, I don't interpret what you are saying as something that

7    requires a Bill of Particulars or even justifies a Bill of

8    Particulars, but let me hear from -- let me hear from you.

9            *MR. LEEDY:*  I mean, you have read the motion, you know

10   what we're requesting.  I will put that on the record, at this

11   point.

12           So, the Epsilon clients or brokers, with whom they are

13   alleged to have conspired, mailed pieces, provide to Epsilon,

14   by those clients or brokers, so the fraudulent mail.

15   Individuals at Epsilon who actually got that mail.  They've

16   alleged individuals had acknowledged fraudulent mail pieces,

17   we're asking who got them, at Epsilon.  And the mail pieces

18   utilized by Epsilon to model the data they then sell in

19   accounts preceding the check accounts.  The actual emails

20   conveying the data to individuals.  And then, the mail pieces

21   received by individuals, in Counts 20 through 28.  The people

22   that sent checks in, in response to some fraudulent mailer;

23   that's what we're asking for.

24           *THE COURT:*  I don't even want to hear it.  Denied for

25   the reasons stated.  I think that you have enough to where a

Bill of Particulars is not required, where a Bill of

Particulars is not appropriate, and I understand that, based on

everything known to me, that you are enabled to prepare for

trial.

What this is, is trying to lock down the trial

testimony of the government, in advance of the trial, and I am

not going to do that.  It's -- the issue is, can you prepare?

There's always going to be disputes.  There's always going to

be unknowns.  There's always going to be surprises.  It's the

nature of trial.  But to say that there's not enough for you to

prepare for trial, based on the volume of discovery, the --

which includes all of the grand jury testimony, I believe, and

that's now confirmed by a head nod from government counsel,

which includes all of the relevant documents that are in the

government's possession, to my knowledge, and includes a

detailed *James* proffer, and it describes the conspiracy, as the

government envisions it.  I just don't think that this is

appropriate, and I -- for -- for Bill of Particulars, and so I

deny it.

Let's move to **83**, the Motion To Compel.

*MS. MORGAN:*  Judge, I think you are probably going to

be happy to know that with respect to the Motion To Compel,

there were only a couple of issues that were outstanding, and

that was whether we were entitled to their reverse proffer and

whether they were entitled to the white paper, um ... I

1  imagine, you already have an opinion about whether we are

2  entitled to those two things.

3       *THE COURT:*  And me sitting here with palms up to the

4  sky should give you a fairly good read as to what I think about

5  that.

6       Again, look, I don't quarrel with the attempt, but it

7  looks like these kinds of things that go back and forth are

8  lawyer debates, and it's like*, Let me see what the government*

9  *said to Epsilon about what it thought.*  *Let me see what Epsilon*

10  *said back about what it thought.*

11       *MS. MORGAN:*  And the reason, of course, that that is

12  important, is because, you know, our position has been, as you

13  articulated, that these are two guys that are operating within

14  the guise of what they believe is a lawful business enterprise.

15  All of the things that would suggest to you that it is a lawful

16  business, are present here, right?  And so, when you have a

17  situation where, all of a sudden, the fingers are being pointed

18  at just, I'm going to say, the three of them, right, because

19  it's my guy who is the business development manager, there's

20  Kessler, who is the vice president, and then Mr. Reger, but,

21  you know, everybody, within that organization, is doing this

22  same job, in the same way, following the same protocols,

23  thinking that this is the way that they do it.  And so, when

24  you get to a situation where, you know, we have the benefit of

25  knowing, months later, years later, Epsilon pleads, they pay an

1  enormous amount of money, we think, *What happened*?  How do

2  we -- how do we go from, *This was all okay, and you guys can do*

3  *this in your business*; to, *Okay, we're not going to sell to*

4  *these people anymore; and then, you know, we're actually not*

5  *even going to operate this anymore*.  We do all of these

6  changes.  But we're telling the government, you know, that this

7  is legitimate to do this, to all of a sudden we are paying

8  gazillions of dollars.

9       THE COURT:  Well, I can tell you what happened, what

10  happened is that one of two people is making a mistake; whether

11  it's Epsilon or you, I don't know.  We're fixing to find out.

12       MS. MORGAN:  So, but our position is that Epsilon,

13  right, has taken, now, a particular position, that we think is

14  inconsistent with the position that they took before.  They

15  also, as part of their Deferred Prosecution Agreement, entered

16  into a clause that's called a Public Statement Clause, and that

17  Public Statement Clause, basically, says *Employees, and*

18  *officials and everybody else associated with Epsilon, you can't*

19  *say anything different than what we've got in this Public*

20  *Statement Clause*.

21       Well, you said something different before, you had all

22  of these people that were interviewed and said something

23  different, and the reason we think it's possible people may

24  change their mind is because Epsilon's counsel came in, at the

25  last hearing, and said, *Well, she might not*, as to

1    Shannon O'Connell, she might not say that this time.

2            So, if there is a difference, we want to be able to

3    use it for impeachment purpose, to show, how it is we got from

4    point A to point Z; that's the reason we had requested that.

5            We also wanted to show the leverage, used by the

6    government, to this company, as to why they might change a

7    validly held position and decide that, *Boy, it's just not in a*

8    *good business position for us to continue to maintain this.*

9            *THE COURT:*  You know -- I mean, you have the leverage

10   argument.  They accuse them, they could prosecute them, they

11   could get millions of dollars in fines from them.  They could

12   X, Y, Z.  I mean, you are not ... uninformed of the leverage.

13   I mean, you almost wish the jury were here, because, you kind

14   of -- you understand, exactly, what it is you are going to be

15   arguing and what you are going to be pushing these people on.

16           I don't dispute that you have got a right to make any

17   of these arguments.  What I'm sitting here saying to myself is,

18   *none of that is really saying anything more than, I think*

19   *attorney discussions might be helpful.*  And yeah, they might

20   be, and at various points in time, but that doesn't mean that

21   they are discoverable.  It doesn't mean that you should have

22   it.  It doesn't mean that you get everything that falls into

23   the pot of *might be helpful.*

24           You know, notes might be helpful.  The attorneys'

25   files might be helpful to you.  Pretty sure your files might be

1   helpful to them.  I just don't think that there is a basis

2   for -- and certainly not one that I have seen presented to me,

3   by way of supporting case law, saying that you get -- in the

4   case of negotiations with a codefendant, you get attorney

5   communications back and forth and negotiations and all of the

6   rest of it.  I mean, you get, at the end -- and, and let's be

7   clear, what I understand, and I commend you and the government

8   for working through much of this, is that *the stuff* that's

9   referenced in those back-and-forths, you have all of *the stuff*.

10  So, it's not like you don't have the ingredients, you just

11  want -- you want -- you got more -- you want the recipe, I

12  don't know, you want the stove, um...

13          *MS. MORGAN:*  I'm a pretty good improvise cook.  I will

14  say that.  So, I don't necessarily need all of those things,

15  but I have to have enough so that I know what to get, and so

16  sometimes, when you have these documents, right, what these are

17  going -- what the information that's provided is, I'm looking

18  for the source.

19          It's one thing for me to stand up here, in a room,

20  where there's no jury that's sitting here and just making my

21  pitch.  It's quite another for me to go back to my office,

22  identify what witness I need to subpoena, what documents I need

23  to get from them, and make sure that I can put them on the

24  witness stand and articulate those things; that's what I have

25  to do in a trial, and so what I'm looking for is the origin for

1   some of these facts and allegations that I believe are going to

2   be contained in these particular documents, so that then I have

3   the ability to do this.

4          It spills over to what our -- what we were saying

5   before, and I know what the Court's position was on the Bill of

6   Particulars, and let me just, sort of, take an aside here to,

7   you know, Mr. Leedy has done the heavy lifting and also has had

8   the leg chewing, but these are motions for both of us.

9          THE COURT: I will put it this way, I nibbled on his

10  leg. I don't think I chewed -- I don't think I chewed on

11  anything. There's nothing aggressive going on here.

12         MS. MORGAN: But I guess my point with that, Judge, is

13  that, you know, what we're trying to do is, this is a case

14  that, I think the Court can tell, is going to trial, right?

15         THE COURT: Oh yeah, I get it.

16         MS. MORGAN: There's a clearcut dispute about what the

17  law requires, and what the facts say, and so what we're trying

18  to do is, in a case that's been identified as taking three

19  weeks to be presented, knowing there is a boatload of evidence,

20  from us to be able to say, *Okay, we want to be prepared, that*

21  *if the government puts Mrs. Y on the witness stand, and Mrs. Y*

22  *starts talking about, you know some astrology mailer*, that

23  we're not sitting here at counsel table going, *We don't know*

24  *what mailer this is*, and now we've got to do all of the links,

25  starting from Mr. Lytle, all the way to, you know, Mrs. Z, who

1  received some kind of a letter, and figure out where we have

2  problems along the way.  What people at Epsilon touched this

3  particular mail piece, right?  What -- after Epsilon decides to

4  sell the data, who are all of these other people?  We're

5  looking at the flow across -- across the spectrum, and if we

6  don't have that information in advance, I really see -- as well

7  prepared as I think we are in this case, I can see us being in

8  a situation saying, *Judge, we're going to have to take a*

9  *recess, we did not know about this particular one*.  And I mean

10 that's fine as long -- the whole --

11       *THE COURT:*  No, no, no, no.  As long -- if the

12 statement --

13       *MS. MORGAN:*  I'm just trying not to be --

14       *THE COURT:*  If the statement was going to be as long

15 as I'm willing to go and have recesses.  No, no, no, no.  This

16 is not a negotiation, and what I mean by that is where, give it

17 to you now or I have to give you a continuance then.

18       At the end of the day we come back to a very simple

19 thing, which is, you have got the underlying data that's

20 referred to in those documents, all right.  The rest of it is

21 the negotiation between attorneys and their characterizations

22 of how they might try it and how they might defend it.

23       Why are you -- give me the case, give me the law that

24 says you are entitled to that.  There isn't any.

25       *MS. MORGAN:*  Correct.

1          THE COURT:  So the motion is denied.

2          MS. MORGAN:  Thank you.

3          THE COURT:  Let me take 15 minutes for midmorning

4    break.  Recess.

5          THE COURTROOM DEPUTY:  All rise.  Court is in recess.

6      (Recess at 10:37 a.m.)

7      (In open court at 10:53 a.m.)

8          THE COURT:  Please be seated.  For what it is worth,

9    being a little anal and compulsive, I went and found my copy of

10   the letter that I couldn't find quickly.  I found it slowly.

11   But I did it and I do have it.  Nonetheless, I thank Mr. Leedy

12   for giving me a second copy.

13          All right.  **One-forty-nine**, 404(b).

14          MR. LEEDY:  Your Honor, I think what we have is a

15   current deadline set by -- the discovery memorandum that we

16   filled out, a long time ago.  I think it's appropriate, in

17   certain cases, to make that a deadline far more in advance of

18   trial.

19          THE COURT:  When is the trial date again?  It's

20   January what?

21          MR. LEEDY:  Twenty-third, Your Honor.

22          THE COURT:  Okay.  So you want a Christmas present?

23          MS. MORGAN:  Yes.

24          MR. LEEDY:  Sure.

25          THE COURT:  All right.  All right.  Fair enough.

1          MR. LEEDY:  So, I mean that's our request.  I believe

2     it's going to, you know, potentially, result in some additional

3     litigation.  We might want to have time to deal with that.

4          THE COURT:  I -- I'm just talking out loud here.

5     Normally I would say 21 days is what the order says; it's fine.

6     I do recognize that's a standard order that's designed, more

7     than anything, to avoid either the need for defendant filing a

8     motion asking for something that you are going to get and

9     something that is designed to avoid having the government on a,

10    at least, theoretical 70-day clock, having to make decisions

11    too early in that clock, and then find out that they're not

12    going to trial and everybody has wasted their time and energy.

13    I don't know that -- I'm inclined to give you some additional

14    time beyond the 21 days, because I think that this case is not

15    the standard case, and to use the standard form in the standard

16    case is a little deliberately blind to the realities of this

17    case.

18          That being said, I'm sitting here and saying to

19    myself, *What is it that I'm going to be dealing with*?  I can't

20    picture what it is that the government is going to give, that's

21    going do anything other than create this kind of an issue.

22    Either the government is going to say, *Well, here's some*

23    *additional*, I don't know, *mailings* or something like that,

24    *that's part of the conspiracy, oh, no, no, no, it's 404(b),*

25    *prejudicial*.  We're going to get into this, is it conspiracy?

1    Is it 404(b)?  Is it res gestae?  Is it 404(b)?  All right.  If

2    we're going to get into it, I guess we ought to have enough

3    time to do that.  I don't think that's, ultimately, terribly

4    productive.  I would hope that if there's 404(b), it would be

5    something of the type of the ilk to -- and I am just using

6    Mr. Reger as an example.  Please don't get excited.  Something

7    of the ilk of, *Well, when he was in his former employer, he*, I

8    don't know ... *sent out ... voodoo chicken blood mailers*, or

9    something like that as -- we could focus on things that are

10    truly 404(b).

11           What I'm going to do is say 45 days.  I do not -- I'm

12    not interpreting this, in granting of this motion, in part, I

13    think 60 is a little too much, 45 is enough to get us where we

14    need to be, but let me be clear, I'm not inviting this as yet

15    another round of debate over whether ... this is a conspiracy,

16    is not a conspiracy, this is part of the conspiracy, this is

17    part of 404(b).  I have my fears, I have announced them, I have

18    articulated them.  I suppose what I'm saying to you is, *All*

19    *right, give them 404(b) within 45 days of trial.*  That being

20    said, I'm not looking for the order saying, to give them

21    404(b), as being synonymous with an order directing the

22    government to produce, 45 days in advance of trial, every piece

23    or aspect or conduct constituting a part of the conspiracy

24    that's not included in the Indictment.  I'm not -- I'm not

25    stepping in the rabbit hole and going down there.  Give them

1    404(b), and we will see what we end up with.  Any

2    misunderstandings?

3                MS. DOUD:  No, Your Honor.

4                THE COURT:  All right.  And then we're left with **74**

5    and **75**, which is the same things as the -- the weighty one, the

6    *James*.

7                I will listen, and let me start with the government.

8    I will start with the government and then I will listen to

9    this.  And the reason I'm starting with the government is I am

10   being brutally honest in saying I don't have a clear memory of

11   what I said, but I have a clear understanding of knowing me,

12   what I think I would have said; that at some point, back in the

13   past, at some prior setting, I made clear that my preference is

14   not to do a three-week trial in advance of a three-week trial,

15   and that my preference is to have a *James* log, and -- and make

16   a decision on that basis, at least provisionally, but I can't

17   say that I have a clear memory of having said that.  So, let's

18   see where we are.

19               MR. REYNOLDS:  Respectfully, I do remember,

20   Your Honor, expressing some disinclination to having a *James*

21   hearing, and otherwise rest on our arguments made in briefing,

22   but that, essentially, *James* hearing is not necessary, in this

23   circumstance, in light of the extensive submissions in the form

24   of the *James* proffer; that there is a basis for everything

25   that's been articulated in the briefing, for finding that each

1    of the 147 statements were made in furtherance of the

2    conspiracy, and that there's some, sort of, ample basis for

3    notice to the defense, and for the Court to make the

4    determination.

5         THE COURT:  Let me ask you something, because there is

6    something that is floating around in my head.  It has not

7    landed yet in a comfortable spot, otherwise I would just tell

8    you what it is that I was doing with regard to that.  Help me

9    out, conspiracy goes from 2008 to 2017?

10        MR. REYNOLDS:  Yes, sir.

11        THE COURT:  Give me the date of employment of

12   Mr. Reger and Mr. Lytle?  And frankly, defense counsel can do

13   it, because I'm sure they know it better, but anybody.

14        MS. MORGAN:  Judge Mr. Lytle was employed from April

15   of -- roughly April of 2012, until January of 2018.

16        THE COURT:  Okay.  And Mr. Reger?

17        MR. LEEDY:  Mr. Reger was on sabbatical as of February

18   2017, and had submitted his resignation as of March of 2017,

19   and I can provide more specific dates --

20        THE COURT:  Well, no.  Here's the thing that -- that's

21   kind of rattling around in my head, and it's not anything that

22   anybody has ... I'm sure I will hear that -- from defense side

23   that they did bring it up, but not in this context.  I

24   understand that the person doesn't have to -- look, if there is

25   the requisite conspiracy, the statements are admissible against

1  persons, and it's not a circumstance where, for example,

2  something that a co-conspirator said prior to Mr. Lytle's,

3  quote/unquote, joining the conspiracy, it could be used against

4  him still.  All right.  But I also understand that if you go to

5  the back end of the conspiracy, somebody withdraws from the

6  conspiracy, co-conspirator statements that occur post

7  withdrawal are not admissible against the individual, who is no

8  longer a member of the conspiracy, fair?

9          MR. REYNOLDS:  Well, Your Honor, I would agree with

10  the characterization, in general, about withdrawal.  I'm not

11  sure we would take the position, necessarily, that Mr. Reger

12  had withdrawn, formally, because there are certain --

13          THE COURT:  And I understand that.  I understand that.

14  That's why I say this is rattling around in my head as

15  something that I would like -- regardless of what I do, I'm

16  going to want some minor additional briefing on that, because,

17  clearly, the law of withdrawal is very ... demanding.  I mean,

18  it's not just, you stop and you go away; but you are out and

19  you have made it clear to people that you are out, and I am

20  speaking loosely, because I don't have the case law in front of

21  me, but conceptually that's my understanding, at least without

22  researching it further.

23          An interesting question is what else must one do in

24  employment context when the conspiracy is my job, my work?

25  Recognizing that the defendants are saying my job, my work is

1    not part of the conspiracy.  Forget all of that, because I

2    don't want to go down those sideroads.  What I'm saying is,

3    once you have been, I don't know, removed, resign, terminated,

4    fired, there's no way you can continue to do the ... the work;

5    whether *the work* is legitimate work, the work is illegitimate

6    work, you are out and everybody knows you are out, because

7    guess what, you don't work there no more.  How does that play

8    with the concept of withdrawal?  And how does that impact --

9    and I don't have this lined out in my mind, the particular

10   statements, whether it's statement, you know **147** or **123** or

11   whatever, as to whether that is or is not -- or as to whether

12   there is even any that fall into this area of concern, that I

13   might have for Mr. Reger.

14        It's just something that when a conspiracy is

15   employment-based, it seems, to me, that that withdrawal may be

16   more definable than in some kind of a loose association, drug

17   conspiracy-type of thing, where you do two transactions, and

18   then there's a long period of silence, or you got arrested but

19   didn't communicate that you are out.

20        I'm not trying to say which way I think is the right

21   answer, because I don't have the right answer.  I'm trying to

22   be transparent in saying that is one thing about this proffer,

23   that remains a little uncertain, in my mind, and that I will

24   like to see additional briefing on, and I hope that neither

25   side is shy, because I'm inviting you to say, *Judge, if you*

1    *have got -- you just screwed this up completely, you don't*

2    *understand, I don't know how you confused yourself, but*, blah,

3    blah, blah, blah, blah.  I'm not sitting here pretending that I

4    have got my arms around some, you know, critical, precise issue

5    that is changing the outcome of the case or not changing the

6    outcome.

7         It is a concern or a question that I have, that I want

8    to get a better answer for, and if that answer is, *Judge, no,*

9    *you are just wrong, stop -- stop thinking.  Just whatever... do*

10   *what we say.*  I won't do that, but I'm not shy about if I'm

11   just completely off base; you just, telling me I'm off base.

12        Ms. Weber can tell you that I may not be quite what

13   you are used to, and in this instance, it should inure to both

14   sides' advantage, because again, it may be -- I don't mean to

15   leave Mr. Lytle out of this.  I think on the front end of a

16   conspiracy, a late joiner, I don't think there's a concern

17   there, but you are certainly willing to bring that up, as well,

18   by way of supplemental briefing.

19        So, I would like to just say that, two weeks?

20        *MR. REYNOLDS:*  Yes, sir.

21        *THE COURT:*  From today, simultaneous briefing, as to

22   late joinder and/or, quote/unquote, withdrawal, and whether or

23   not -- how those concepts relate to this case, and what it

24   means in terms of the admissibility of some.  And I haven't --

25   I can't tell you which, but some of these statements, because I

1    know that some of the statements occur after, or at least I

2    have been told that they are after Mr. Reger left the company,

3    and again there's two kinds of statements -- there's two kinds

4    of -- well, I'm just going to stop.  I don't want to keep doing

5    this, and having it seem like I'm trying to feed answers to one

6    side or the other.  I'm not.  It's just a concern.  I want to

7    get a little more understanding from the parties as to how you

8    see it.  I don't know whether there's case law out there on the

9    concept and we'll see, but beyond that, I think we're all in

10   agreement as to what, at least in dealing with the rest of it,

11   there has to be established, by a preponderance, the conspiracy

12   existed, declarant was a member, the statements were made, in

13   furtherance, and during the course of the conspiracy.  I don't

14   think there's any dispute about those being the factors, and so

15   I guess I will hear... I understand, you are saying, *Look, I'm*

16   *resting on my submission*.  The way this tees up for me is

17   somewhat difficult, although I'm actually now previewing for

18   the defendant, I don't really have a line-by-line kind of

19   response of, *No, this one is bad, because of this or that one*

20   *is bad, because of that*.  It's a -- we're back where we were

21   before.  It's the defense.  It's all of them were, *there was no*

22   *conspiracy, the declarants weren't members and it wasn't in*

23   *furtherance of*.  And so, it becomes difficult, because I'm,

24   essentially, being asked to say... in sweeping terms, as

25   opposed to focused terms, that this statement does not -- isn't

1  any good.

2       Now, I will deal with them momentarily.  In terms of

3  you, there's something that you were trying to say, that caused

4  the defendant some concern, that I'm not entirely clear,

5  exactly, what it is that you were driving at, in terms of this

6  notion of, *Well, it has to be some kind of a conspiracy, but*

7  *not this kind of a conspiracy.*

8       MR. REYNOLDS:  Your Honor, I think I understand what

9  you are saying; the suggestion that, for purposes of this

10  finding there can be a conspiracy, contemplates an agreement to

11  commit a lawful act, is a little bit distinguishable from the

12  conspiracy to be proved at trial.  I think, for our purposes

13  here, we would take the position, by a preponderance of the

14  evidence, there's sufficient basis to establish the factors

15  that you just articulated; that indeed there was a conspiracy;

16  declarants were members; and it was furtherance of the

17  conspiracy for each of the different statements that are there.

18  That is an alternate basis that was decided, in a court, I

19  believe in this building, that there could otherwise --

20       THE COURT:  You think people in this building listen

21  to me?

22       MR. REYNOLDS:  Sir, I don't know.  I'm an interloper.

23  I rely on Ms. Weber.

24       THE COURT:  Well, she laughed, so I suppose that means

25  the answer is no, but in any event, you know, I understand, I

1    looked at it, and my reaction to it was there may be a scenario

2    where I could see that, where, for example, two people are

3    charged in a crime, and they are not -- they may not not even

4    be charged with a conspiracy, but there could still be a

5    conspiracy that exists that permits their statements to be used

6    against one another.  I have a hard time -- and I did not

7    pursue, I think it was Judge Jackson's opinion -- was it --

8    yeah.  To be frank, I didn't really try and follow it, because

9    it just struck me as just too much, for this case, to say,

10   *Here's the conspiracy we're trying prove, by way of conviction,*

11   *hey jury, here's some other conspiracy, that's floating around*

12   *out there, that's not charged, and any and all of these weird*

13   *little conspiracies, that may or may not be the same ...* no.

14   To me, is there -- is the charged conspiracy, the one that you

15   are trying prove, does that exist?  Are the declarants members?

16   Are the statements in furtherance of -- during and in

17   furtherance of the conspiracy?  And that's the way I'm looking

18   at it, and I want to be clear.  I don't completely understand,

19   as the record will reflect, by my attempting to articulate it,

20   the alternate legal theory; but I reject it.

21           *MR. REYNOLDS:*  Yes, sir.

22           *THE COURT:*  Let me hear from the defendant.

23           *MR. LEEDY:*  Well, Your Honor, I think we agree on the

24   standard, and my recollection of what the Court said, and I

25   believe it's the government' recollection, is that you were

1    inclined not to conduct a hearing.  I -- when I hear that, my

2    inclination is evidentiary hearing, with a witness on the

3    stand, typical *James* hearing; not a hearing where we can

4    proffer evidence to the Court, argue that evidence --

5            THE COURT:  No, I know, and I seem to have this vague

6    memory, but it's so vague that I'm not sure it's real of you

7    saying, *Hey, we're going to be able -- I want to take a shot at*

8    *convincing you, because I think we can convince you that, in*

9    *this case, we need a real -- a real-live-witness James hearing,*

10   *in advance.*

11           MR. LEEDY:  I still believe that, Your Honor.

12           THE COURT:  I know.

13           MR. LEEDY:  And I would like to take this opportunity

14   to discuss why.  Some of it has come up in the other motions,

15   and the Court is not unaware of why I think it's appropriate,

16   but it is a long time.  It's a decade that we're talking about,

17   and it involves quite a few people, quite a few entities, and

18   in order for the Court to make sense of that, quite frankly,

19   that evidence coming in through a witness that knows about it,

20   is probably the clearest way for that evidence to come in.

21   That witness can be asked questions about the evidence.  The

22   witness can respond to the Court.  Both parties get a chance

23   to, essentially, voir dire the basis for the statements that

24   the government seeks to get in under 801(d)(2)(e), but I

25   believe, honestly, and I don't think it would be a three-week

1    pursuit.  I think it would be a day-or-two pursuit, to have

2    that type of a hearing, here, where, for instance, the witness

3    would be presented with the underlying -- what I will say is --

4    collateral evidence; the actual communications that the

5    government seeks to admit, when they are available, and the

6    Court gets to hear the context of those statements.  What was

7    established when.  Understand the timeline.  And I will give a

8    representative example of why I think that's important.

9        I'm going to stick with, at this point, just

10   statements where Mr. Reger is listed as a declarant in the

11   statement, and I am doing this because, from our perspective,

12   those, obviously, have some importance.  And the first two,

13   Your Honor, occur -- well, I will stop.

14       The first one is alleged to have occurred in July of

15   2018.  The second one is alleged to have occurred some time

16   between -- I'm sorry -- July of 2008.  The second one is

17   alleged to have occurred an unknown date between 2008 and 2010.

18       Now, these both relate, based on the log, to the same

19   fraudulent mailer, Destiny Research Center.  You've heard me

20   say that before, DRC.  One is related to an on-boarding

21   communication at Epsilon, where Fritz Kessler is assigned to be

22   the account executive on the DRC account, and that is listed in

23   Count 1.  There are discovery references in the far right

24   column there, which actually include the on-boarding documents,

25   related to the email that actually went out, that contains the

1  statements the government seeks to get; that's, essentially --

2  well, it's the first communication related to that particular

3  client, DRC.

4         The next statement related to that client either

5  occurred some time in 2008 or in 2009 or 2010, and I don't

6  believe anybody knows the answer to that, but we know that

7  individual who related that, it was Fritz Kessler, and we have

8  information related to what Mr. Kessler said, both in the grand

9  jury and in memorandum of interviews, that would be relevant to

10  this Court's determination as to whether or not there was a

11  conspiracy in '08, '09, '10; and that explanation, Your Honor,

12  is important, because the next entry we get, that involves

13  Mr. Reger in the declarant column is 2013, which is a five-year

14  gap from the first statement alleged to include Mr. Reger as

15  the declarant.

16         From the 2013 statement, we jump to a 2015 statement,

17  and then there are several that continue after that, until we

18  get to 2016, where they become a bit more regular. But I will

19  tell you this, Your Honor, and I mentioned this before, I

20  believe what will help the Court understand whether or not a

21  conspiracy existed, will be the communications related to

22  particular mailer clients, when they occurred and who they

23  involved. For instance, that Destiny Research example, that is

24  a ongoing communication string that begins in 2008 continues to

25  2016, and with regard to Mr. Reger, the communications

themselves span six-month periods, year-long periods, two-year periods, during which I think the Court will have to evaluate, whether or not a conspiracy existed.  And I think that the summary testimony of an individual that knows those statements, knows the participants, can tell the Court, perhaps, through their knowledge, who was writing whom and what their role was in that, for instance, the first email, why was somebody writing an on-boarding email, will help the Court decide what agreement was in place, if any, at that point.  Who the participants were, if they were co-conspirators and if the statement was in furtherance of that.  Otherwise, the Court is left with the, you know, 140-some-odd statements that span over ten years, with, you know, multiyear gaps in there, that exclude individuals, both Mr. Reger or Mr, Lytle for long periods of time, and don't provide the context that, I believe, in part, is noted, in that far column on the *James* log.  The actual Bates labeled grand jury testimony or discovery, that contains these statements, and that's the crux of it, I think Your Honor.

        The Destiny Research example, for number one, includes a date range of almost 30 pages, it has that on-boarding documentation in it.  It has individuals noted in that on-boarding documentation that are not just Mr. Reger and Mr. Kessler, but the statement that lies therein, that the government would like to get in as co-conspirator hearsay, is

1    somewhere in that context that the Court does not yet have.

2    The government did not attach those dates numbers to the *James*

3    proffer, but identified them.

4           That, in part, Your Honor, is why I think an

5    evidentiary hearing where a witness is -- or witnesses -- the

6    best way to go, and it's the preference here, and this, I

7    think, is one of those cases where that make as lot of sense.

8    I think the more complex the case, the longer the conspiracy,

9    the number of participants and the number of participants and I

10   will say this, the number of, potentially, separated

11   conspiracies, that might be at issue for the Court to consider,

12   would be something that would be borne out in that testimony as

13   well.

14          We have individuals that work for fraudulent mailers,

15   alleged by the government.  We have representatives that are

16   brokers, that worked for those mailers.  We have individuals at

17   Epsilon that work with brokers, but not directly with mailers.

18   We have individuals at Epsilon that work with mailers and not

19   brokers.  Those relationships define what the communications

20   mean; that's the *in furtherance* requirement, and I think

21   without that background and that context, the Court will be at

22   a loss to determine the significance, or lack of, for these

23   communications.

24          And again, I think that what the Court asked about

25   before, with regard to the temporal period where statements can

1    be against an individual, Epsilon left, that could narrow the

2    scope of this hearing, to some degree, so the Court would have

3    that -- well, could have that briefing before we would have

4    that hearing, to narrow the amount of statements that we're

5    actually talking about.

6         I think there are some that could be dealt with

7    without testimony presented, which could also shorten the

8    evidentiary presentation, via a witness.  If -- and if -- I

9    think the parties can identify those in advance and submit that

10   to the Court with this collateral information attached, then

11   the Court can, potentially, make rulings before any hearing

12   would occur, shortening the period of that hearing.  That's

13   what I would propose, and that's what I think would give the

14   Court the best perspective in making determinations that it has

15   to make on these, outside of the presence of the jury.

16        MR. REYNOLDS:  Your Honor, I will make a couple of

17   clarifying points, that I do think do impact this determination

18   and others.

19        First of all, in the, kind of, taxonomy of

20   participants in this whole plotline, we have individuals at

21   defense table, employees of Epsilon, we have brokers, right,

22   and clients, and there has been, I think, some alighting of the

23   brokers and clients distinction, and for purposes of

24   articulating the conspiracy, as we put in our James proffer,

25   and if you look in paragraphs, just for the record, 13 and 14,

1    for example, of the Indictment, the brokers are within the

2    ambit of the conspiracy but the clients are not.  There are

3    quite a few of them; lots of them.  They are transient over the

4    course of ten years.  Some come, some go.  Before I get too

5    wrapped around the axle, unnecessarily complicating this

6    conspiracy question, I do think it's important to identify the,

7    sort of, finite universe of potential co-conspirators.  Every

8    single person whose statement could be the basis of the

9    co-conspirator exception falls within that much smaller

10   universe.  Epsilon employee, either defendant, Epsilon

11   employee, or broker.  There are only three brokers.  So that's

12   one point I would like to make.

13          Secondly, I don't know if it's constructive to go,

14   necessarily, tit for tat with every single statement that

15   counsel identified, but just as a for instance, we're talking

16   about an on-boarding email, it's the very first one; one out of

17   the 147, in July of 2008.  I think there's sufficient

18   information here to identify whether there's enough of a basis

19   to suggest that there's an appropriate co-conspirator exception

20   to allow that statement to be introduced, and will note that,

21   as Your Honor can see, the Bates ranges of each statements are

22   provided on the *James* log.  Counsel has them, so we could be in

23   a situation, whether or not this is exactly what counsel is

24   advocating, where we have a witness on the stand, who is then

25   going to be shown an email and asked, *Well, who is this email*

1    *to? Who was it from? When was it made?* This is information

2    that we have and counsel already has. If the Court would find

3    it helpful, in a determination, for the government to provide a

4    copy of each of the documents to substantiate these 147

5    statements, so Your Honor can see for yourself whether or not

6    the government's description of the participants and the timing

7    is accurate or something like that, I'm just throwing this out

8    there, of course, the government can do that, easy enough.

9         And as for the potential, sort of, date range of this

10   *other statements*, and I will just pause here after this, that

11   counsel identified --

12        THE COURT: Date ranges don't bother me.

13        MR. REYNOLDS: Okay.

14        THE COURT: I mean, look, if I'm in a conspiracy and

15   you have got a co-conspirator statement from me, from day one,

16   and the next co-conspirator statement you got from me is from

17   day 4,000, it doesn't mean that there's not -- either one of

18   them is not a co-conspirator statement. It's ... what it does

19   mean is that, perhaps, you are going to have a harder time than

20   you want to have convincing a jury that, you know, Mr. Reger

21   was involved in a conspiracy, if he is only, you know,

22   peripherally or occasionally or, you know, once every five

23   years, saying something that you think is a co-conspirator

24   statement; but that's for the 12; that's not for me.

25        So ... I interrupted, go ahead.

1          MR. REYNOLDS:  Sir, there's not much else.  Simply to

2     say, it sounded like, that the fact we can't, with precision,

3     articulate when this informal conversation between Mr. Kessler

4     and Mr. Reger occurred, some time in the two-year time period,

5     that may sound like there's some complexity to the case, but

6     that has nothing to do with the analysis of whether or not it's

7     appropriately admitted co-conspirator statement.

8          It was a conversation, it was a long time ago, and

9     that will come out on the witness stand; doesn't remember

10    exactly how long ago.

11         Other than that, we will simply say that there's no

12    need for a hearing, which will be fairly redundant for -- given

13    all of the submissions that have already been made.

14         THE COURT:  All right.

15         MS. MORGAN:  Judge, can I have an opportunity?

16         THE COURT:  Absolutely.

17         MS. MORGAN:  Thank you.  We too are making the request

18    for a hearing, as I'm sure you know.

19         THE COURT:  To the extent that it was not otherwise

20    clear, I so recognize.

21         MS. MORGAN:  Okay.  But something that you just said,

22    in your comment to counsel, made me think that I wanted to

23    supplement what Mr. Leedy had said, and it was this.

24         THE COURT:  That will teach me.  Go ahead.

25         MS. MORGAN:  That it was -- it was for, you know,

1    these folks to decide, and I guess I am viewing this particular

2    motion as to whether or not there is a conspiracy, different --

3          THE COURT:  Hold on, hold on.  You are correct that

4    that statement is subject to a deeper meaning than I meant to

5    pump into it.

6          My task is to decide whether a conspiracy existed.

7    That doesn't get passed over to them, for purposes of admission

8    of the admissibility of the co-conspirator statement.  I get

9    that.

10          All that I meant to say is, to be commenting on the

11    fact that there's a hotly contested issue of guilt or

12    non-guilt, but it's also clear that the question of whether the

13    conspiracy existed, that is before the jury, is not quite the

14    same as the one that's before me, because the issue before the

15    jury is beyond a reasonable doubt.  The issue before me is

16    simply, have I been given enough to establish, by a

17    preponderance, that a conspiracy existed?

18          And so, my exchange with counsel, you are correct in

19    saying, *Wait a minute.  What are you talking about?  The*

20    *decision as to whether a conspiracy existed, is one that you*

21    *cannot pass to them.  You must make*, *as a predicate to*

22    *admission to any of these statements*.  I agree with all of

23    that.  All that I was meaning to comment on, is there are --

24    and you and Mr. Leedy continue to bang the drum, if you would,

25    for my benefit, to identify inherent weaknesses in the

1    government's case.  I recognize all of those positions that you

2    take.  I don't weigh in on whether you are right or they're

3    wrong, necessarily, but I recognize that there are debatable

4    and hotly contested issues.  That's not really what I was

5    trying to drive at by saying that, you know, *These gaps don't*

6    *mean anything*.  The burden is on them; I get that.  The burden

7    is not on you.  The burden is on the government to show that a

8    conspiracy existed, by a preponderance.

9         What I do -- what I recognize is, they have given me a

10   great deal of information from which to make that -- to draw

11   that conclusion, by a preponderance, and solely by a

12   preponderance.  They've also advised me, with regard to the

13   fact that three, at least, members of the conspiracy or

14   admitted members -- three people who are said to be members of

15   the conspiracy, and who have pled guilty to criminal charges in

16   connection with their business activities, not pled guilty to

17   this conspiracy, necessarily, are going to be testifying, I

18   have ... I simply am presented with the question of, I'm

19   obligated to say whether the evidence shows, by a

20   preponderance, that a conspiracy existed, and I can consider

21   the statements themselves.  By themselves, not just the

22   statements, but they can be considered, and taking all of that,

23   and putting it on the scale, do I have enough to say, by a

24   preponderance of the evidence, that there was a conspiracy, the

25   declarants were members and the statements were in furtherance

1    of and during the course of the conspiracy?  And what I'm

2    hearing back, in response is... what I heard in every single

3    motion, which is, *They ain't got it.  It's not there.  This is*

4    *legitimate business activity.  Don't let them* -- again, I'm --

5    I'm exaggerating -- *con you into finding things to be true that*

6    *are not true.  And give us our hearing.  We can Cross-examine*

7    *everyone as to each and every particular.  Give us our hearing*

8    is not really much of a response to, is this sufficient on --

9    by a preponderance standard?

10          I just think, it's how I started this hearing, by

11    saying, each side has it's tent pole, and you are standing by

12    that tent pole on every single one of these motions and saying

13    exactly the same thing, under a different legal theory.

14          So anyway, long covering of my rear end.  Go ahead,

15    counsel.

16          *MS. MORGAN:*  Well, and I appreciate what the Court is

17    saying.  I guess, from our standpoint, and the reason that we

18    wanted to have a hearing is, first of all, I mean, look, it's

19    not secret that we don't believe a conspiracy existed, right?

20    Okay, fine, but it's also the government's burden to establish

21    when the conspiracy actually started.  So, you know, they can

22    say it's in 2008, because they have got these handful of

23    statements, but, I mean, did it start in eight, eleven,

24    thirteen, sixteen; when -- when did it actually start?  And I

25    mean certainly, when you have just a smattering of things in

1    2008 and 2009, one questions whether any conspiracy actually

2    started in 2008.  And since my client has always been, you

3    know, sort of deemed the business-develop manager, who was

4    bringing these prospective clients on Epsilon's door, you know,

5    he didn't start until 2011, so there's certainly an argument

6    that, at best, started at 2011, but --

7            THE COURT:  Or --

8            MS. MORGAN:  Or.

9            THE COURT:  Or that it started in 2008 and he joined

10   in 2011.

11           MS. MORGAN:  But I guess my point is, in terms of what

12   the government has presented, what I feel like continues to be

13   missing, and I think the reason why Mr. Leedy and I continue to

14   bang on this, is because you can't just say these -- these two

15   things are true.  You can't have these two bookmarks.  You

16   can't have Mr. Lytle and the other business development

17   manager, you know, at one end of, okay this company comes --

18   this client -- prospective client comes to Epsilon's door and

19   then have this false mail piece, if it is indeed deceptive,

20   under some standard, and then ignore everything that's between

21   here, because they are charged with causing.  So, we are

22   continually not looking at, did they cause this conduct that

23   the government is complaining about?  Because if they didn't

24   cause it, they are not members of the conspiracy, if there even

25   is a conspiracy, and I guess that's the thing that -- the

1    reason we're harping on this is because Fritz Kessler is one of

2    those people that has pled guilty.  There's two brokers who

3    have pled guilty and the things that they say don't bear on

4    their -- their involvement, and that's why we keep pointing to

5    the Court, and this was part of my Motion To Dismiss Based On

6    Grand Jury Conduct, but we had, you know, Stacey Hawes is the

7    person who got the creative solicitation, and then, got the

8    contract and was the one who made a decision; *Does Epsilon do*

9    *this, or does Epsilon not do this*?

10        And I think the Court has to consider, you know, is

11    the fact that Mr. Lytle's role is merely to bring a prospect to

12    his boss' door and say, *Do you guys want to do business with*

13    *these people*?  And then somebody else, that has the authority

14    to bind a multimillion-dollar company, makes that decision,

15    with all of the information necessary, how is that causation

16    for him?  And I think the Court has to make that preliminary

17    determination, and I think it's difficult to make that

18    preliminary determination at the time the testimony is coming

19    in.  I think the Court needs to hear it, in advance, and make a

20    decision about whether they have met the preponderance of

21    evidence standard as to whether a conspiracy existed, and

22    whether Mr. Lytle and Mr. Leedy (sic) were members of it.

23            *THE COURT:*  Well, I don't think Mr. Leedy was.

24            *MS. MORGAN:*  Yeah.  I don't mean this guy.

25            *THE COURT:*  I take your point, nonetheless.

1          MR. LEEDY: It's not the first time that's been

2    alleged.

3          THE COURT: Go ahead.

4          MR. LEEDY: Your Honor, I suppose, I understand, the

5    first statement I made to the Court in support of the hearing

6    was kind of a broad-strokes procedural request, where I think

7    that would be the most effective way to deal with these. But

8    with regard to individual examples, I think that James log

9    bears those out. We talked about the first two, number 22, is

10   broadly referenced as a declarant that has to do with the

11   conversation with Jeff Krech where he told Jeff Krech that he

12   was -- I think it's Jeff -- Mr. Krech that he would be working

13   with smaller clients and clients nobody wanted. So, at that

14   point is the Court, based on the representative examples that

15   are said to be statements in furtherance of a conspiracy, does

16   the Court have enough information to rule that statement there

17   is in furtherance of a conspiracy, and if so, what conspiracy

18   and with whom? The clients aren't identified, Krech doesn't

19   provide any additional information, and the Court is left with,

20   that comes in because it's promoting the objective for the

21   conspiracy.

22          The Court has been given nearly nothing to consider

23   entry 22 in consideration of whether or not a conspiracy

24   existed, whether or not the declarant, participants in that

25   conspiracy, and whether or not it was in furtherance.

1          And the same for the next one, where Mr. Reger is

2    mentioned, these are statements made to Sony Boone, who is

3    general counsel for DMA; kind of like the ethics body that is

4    an industry group and people in marketing belong to.  And,

5    Mr. Reger, at this point, according to this communication is

6    providing his service to that nonprofit, as a volunteer, to

7    evaluate a complaint made against somebody, under the DMA

8    guidelines, and explaining it to Sony Boone, general counsel

9    and executive director of the DMA.  There's a conspiracy at

10   that point, and I don't know what it is, as alleged by the

11   government.  But further, that is supposed to be made in

12   furtherance of said conspiracy?

13         The context is simply what Mr. Reger said to Sony

14   Boone about what his response was, to the assignment he was

15   given by the DMA.  There is no mention of those statements made

16   to anybody other than Sony Boone.  There's no information that

17   Sony Boone is communicating with anybody else about those

18   statements, and the Court is told that the conspiracy existed

19   at that point, and this -- these statements, which include kind

20   of a bullet-point analysis of the complaint as unrelated to,

21   what I understand, an Epsilon client, are in furtherance of

22   that.  The Court has zero context to consider what that is, and

23   hasn't considered the collateral information that this

24   information came from, which is the memorandum interview from

25   Sony Boone.

1    I don't believe the Court has the information it needs

2    to make those type of decisions.  It hasn't been presented as

3    enough information on that, on 22 or 27, as articulated by the

4    government, and I think that's why, an evidentiary hearing is

5    required.

6    Some of these are ... seriously less clear than

7    others, and require additional evidence to be presented in, I

8    guess, on top of what we have are summaries of what these

9    statements are, without a basis for establishing what the

10   conspiracy was and how was it in furtherance.

11   It's not enough information for the Court to make that

12   determination, and I think the best way to handle that is to

13   have a hearing on this, as is normally conducted.

14   THE COURT:  Normally conducted by whom?

15   MR. LEEDY:  Well, as preferred in the Tenth Circuit.

16   THE COURT:  All right.  Motion For A James Evidentiary

17   Hearing is denied.  I explained ... well, obviously, a primary

18   purpose of a James hearing is to advise the defendant as to

19   what statements are going to be submitted as co-conspirator

20   statements, and then, of course, the admissibility of those

21   statements has to be established by a preponderance.

22   I said, some time ago, what my preference is.  It

23   remains my preference.  And so the government filed a James

24   log, that identifies each of a hundred and ... whatever it is,

25   47 statements, with regard to each of them, particularizing,

1    not only who the statement is, who is the declarant, when it

2    was made, and the basis under which it was being offered,

3    recognizing that the types of statements that can be deemed to

4    be in furtherance, can cover a wide swath of conduct.  The

5    response to that is to persist in saying, *We think you should*

6    *have an evidentiary hearing*; that's really not a response at

7    all to whether or not this is sufficient.

8            To say, *We think you should have an evidentiary*

9    *hearing because, it could be this or it could be that or it*

10   *could be the other*, again, is really not a response to this.

11   What I have is very specific statements, very specific

12   justifications and very specifically identified

13   characterizations of the conspiracy, its members and general --

14   general evidence that supports the allegation that a conspiracy

15   existed among employees of a particular unit to, basically,

16   with full knowledge and awareness of the fact that people were

17   being defrauded, coming together and for their own

18   self-interest, by way of bonuses and salary and things of that

19   nature, entering into a conspiracy for mail fraud and wire

20   fraud, and I am given particular pieces of evidence that tend

21   to show the example -- the existence, I should say, of that

22   conspiracy.

23           The fact that there may be an alternative way of

24   evaluating things is not an answer to whether or not what I

25   have been given is sufficient.  It's just not.  It's, *I want to*

1    *Cross-examine, Judge*.  I get that.  But I almost shrug my

2    shoulders and say, *The entirety of this response is again, the*

3    *nature of the dispute here.  They say*, they being the

4    government, *there's a conspiracy.  We say, it's just business*.

5    The question is, is there enough, by a preponderance, given the

6    matters contained in the government's *James* submission, for me

7    to conclude that a conspiracy existed?  Is there enough to

8    conclude that the declarants are members, and is there enough

9    to conclude that the statements are in furtherance of?  There

10   really has been no effort, except a very late effort to go,

11   *What about this?  What about that?  You may need to know this.*

12   *You may need to know that.  If you knew more, your context may*

13   *change.*  I suppose all of that is true, but the question is

14   whether what I have is enough to say that is conspiracy

15   existed.  Not whether or not ... well, forget not whether or

16   not.  It is.

17          So, on the basis of what I have been given, which is

18   very specific statements, very specific identifications, very

19   specific persons, and at least evidence that has been

20   articulated, as to the boundaries of the conspiracy, the

21   members of the conspiracy, what evidence supports that, both

22   within and without of the statements themselves, I find that

23   there's a conspiracy.  It is the conspiracy that the trial is

24   about.  The declarants are members and the statements offered

25   are in furtherance.  I think the response is simply, again, an

1    effort to get me to argue or to find that there's no conspiracy

2    or find something different, or to decide the ultimate issue.

3         In saying that I'm not -- I don't want to be perceived

4    as speaking too broadly; and what I mean by that is, by saying

5    that I do not have an obligation to decide whether the

6    conspiracy is there.  I do.  But it's a preponderance standard.

7    And to say to me, *Well, if you did this, you might hear more*.

8    Well, that may be true, and maybe it would be any number of

9    different reactions that I would have to any number of

10   different things, but I basically said, *Give me a James log*,

11   and you did.  I basically said, *Give me your objections to it*.

12   And your objections to it are*, Ahhhh, There's not really a*

13   *conspiracy here*.  Okay.  That's a legitimate position to take.

14   I don't deny that, but is there enough to conclude, by a

15   preponderance, that there's a conspiracy?  The answer is yes.

16        And as for the rest of it, you know, the argument

17   over*, Well, look this is ... this is just business.  The*

18   *unspoken agreement relies on the possibility of mere knowledge.*

19   *There's not -- there's not ... responsibility on Lytle or*

20   *Reger, because they don't have procedures*.  All of that is

21   argument directed to the ultimate issue, in a different

22   context; meaning, whether or not they are guilty.

23        I grant you that defense counsel can and would, will,

24   disagree with that, and say, *No, it's directed to whether or*

25   *not this stuff, in a business context, is sufficient to*

1    *establish conspiracy*?

2         By a preponderance, given all of what I have received,

3    it is; and whether it's by beyond a reasonable doubt, that's a

4    question for another day, but there's very little that I have

5    that is focused on a particularized statement, a particular

6    objection to it.  It's all, again, at the global level of, *This*

7    *is fraud.  No it's not; this is business*.  That will get

8    decided.  But for purposes of today, what I have to decide is

9    whether or not, given what I have been given, by way of a

10   proffer is sufficient.  The answer is, it is on the basis of

11   the matters submitted to me.

12        I'm not going to order a further hearing.  I'm not

13   going to order an evidentiary hearing, and I don't find the

14   that the global-level arguments about conspiracy is enough, in

15   this case, on the record that I have now, to say that the

16   government has failed to establish, by a preponderance, that

17   there was a conspiracy, and that these statements were by

18   declarants speaking in furtherance of and during the course of.

19        Now, that is, of course, subject to some additional

20   trimming, based on what I get by way of the additional

21   briefing.

22        So, to the extent that the motion is for a *James*

23   hearing, motion is denied.  To the extent that the issue before

24   me is the admissibility as co-conspirator statements; meaning

25   on hearsay statements of the matters submitted to me, I find

1   them to be, as I have indicated, by a preponderance, and only

2   by a preponderance, part of a conspiracy, in which the

3   declarants are members and they are statements in furtherance

4   of and during the course of.

5              As I recognize this is going to be revisited, any

6   further record?

7              MS. DOUD:  No, Your Honor.

8              MR. LEEDY:  Um ... no, not as to that, Your Honor.  I

9   think that I would like to confer with codefendant counsel

10  before we move on --

11             THE COURT:  I don't think there's any on to move to

12  today.

13             MR. LEEDY:  We may have some additional requests in

14  the housekeeping department for the Court.

15             THE COURT:  Okay.

16             MS. MORGAN:  I would just like to clarify the record,

17  or make further argument, whatever it is that I'm doing right

18  now.

19             So, when the government proffered their evidence, as

20  they did, and we filed our reply to that, we, basically,

21  articulated, why it was.  Because they had -- they had set it

22  on a global level, right, that we responded as to why we

23  believe that there was no conspiracy, and we identified the

24  things that we felt like had not been considered, and laid out

25  pieces of evidence that we believed supported the need for the

1    Court to do further inquiry.

2            THE COURT:  No, I understand that.  And you are

3    correct, you have said such things as knowledge and membership,

4    contractual relationships were guided by the terms of master

5    agreements that others created.  Some things were, you know --

6            MS. MORGAN:  I guess I just wanted to be clear that we

7    certainly had provided the Court with information that could be

8    considered, in terms of whether or not this -- this factored

9    into -- I mean, simply because they have to have a

10   preponderance of the evidence standard, and that's a lower

11   standard, still doesn't mean that it doesn't have to be

12   weighed.

13           THE COURT:  No, no, no.  I --

14           MS. MORGAN:  And so, from our standpoint we felt like,

15   look, even if you think you have this conspiracy, if you factor

16   in these other things that we were bringing to the Court's

17   attention in our response and in our exhibits that were

18   attached to that response, those, we believed, had we been able

19   to put on more evidence, about those.  We don't -- you know, we

20   don't have the ability, since we, you know, haven't taken sworn

21   statements, in front of a grand jury, et cetera, we don't have

22   the ability to do that, except to say, we have -- we have all

23   of these things and these should be enough to say, I want to

24   hear more, and then we call a witness in, to explain how that

25   operation works, so that the Court can make the kind of

1    decision that it needs to make.  So I guess --

2          *THE COURT:*  Go ahead.

3          *MS. MORGAN:*  I guess I wanted to make sure that -- I

4    mean that was my thought process, at least, in how this was

5    going to go.  I mean, I was not entirely clear on how it was

6    going to go.  Obviously, I'm enlightened now, but I think the

7    other thing that is troublesome, I mean, yes, they have

8    identified specific statements, but what they haven't done is

9    they've given just a handful of samplings of mailers, but they

10   have not said, *This is the creative that David Lytle received,*

11   or *That this company received from this mailer, and it's also*

12   *the same mail piece that some lady got and sent in her 20*

13   *dollar check*.  They just throw out these samples, and I guess

14   that's where we're like ... I mean, you are talking as if it's

15   in furtherance of some conspiracy, but the conspiracy only

16   exists if there is actually a deceptive mail piece.  It has to

17   be a specific document, because they are in the business of

18   commercial mailing.  It's -- anybody can send out anything, so

19   long as it's not fraudulent.  So you have to have a specific

20   document to do an analysis of whether that is actually a

21   fraudulent mail piece.

22          So whatever comes in to David, and then goes to

23   Stacey Hawes to sign off on, that goes to all of the other

24   people in the company to send out data, and then is actually

25   the same thing that goes out through the mailer, lands in the

1    lap of Mrs. Z, and Mrs. Z sends in her $20 check for her sweeps

2    report.  That has to be the same document, and that we don't

3    have.  They have not said that, because they can't, and that, I

4    think, is what we were hoping to be able to establish, by

5    having a hearing.

6         THE COURT:  Look, I understand that, and all that I

7    was -- well, what I was primarily focused on is that the

8    response to the very specific proffer is a more global response

9    than a, *No, this statement we object to on this basis, that*

10   *statement* -- I mean, it basically is, you object, because it's

11   not -- there's no conspiracy, obviously.  If there's no

12   conspiracy, the declarants weren't members, and obviously the

13   statement wasn't in furtherance of; and so, in terms of whether

14   or not these things are in furtherance or declarants are

15   members, there really isn't a focused response here.  What

16   there is is, *There's not enough for you, Judge, to conclude*

17   *that a conspiracy existed, and therefore, you should take*

18   *out -- you should keep all of these statements out,* and I

19   understand the argument.

20        I also understand, by a preponderance, we could go

21   back and forth, and I am not here to go back and forth, but we

22   could go back and forth, over how accurate it is that they have

23   to show that Sally Sue mailed her $20 in response to X, Y or Z.

24   If the proof fails, then the proof fails.  But for purposes of

25   establishing, by a preponderance, what I have got, is people

1    who are going to testify that their conduct was knowing and

2    fraudulent, or -- that is not fair -- that they knew that they

3    were ripping people off, to simplify it.  Other people that are

4    going to testify that there were responses to government

5    activity to, kind of, shut this down, that were concerned with

6    their own economic pocketbook, and other responses about other

7    people being crooks and things of this nature, persons who are

8    identified as co-conspirators, going to be available and

9    testifying that they were part of a conspiracy, and with all of

10   that, is it enough to say, by a preponderance, that they get to

11   go forward, and my answer to that is yes.

12          Do I think that your issues are not substantial?  No,

13   they're substantial.  Are they substantial enough for me to say

14   that the government has failed to establish, by a

15   preponderance, what's been given X, Y and Z?  No.  I don't

16   think so.  Because you create a scenario that I don't

17   necessarily think is right.  I don't think it's necessarily the

18   case that one has to have the particular mailing, and I have to

19   get Sally Sue Grandma to come in and say, *I actually believed

20   that, you know Madam Voodoo did predict my future*, or whatever

21   the heck it is that caused me to send in the 20 bucks, and that

22   the only way that this was -- that these individuals, Mr. Lytle

23   and Mr. Reger, could be part of the conspiracy, and the only

24   way that they could have, quote/unquote, caused mailings to

25   issue, is to be the one to... be the final ... stop in the

1    decision-making train, and I don't think that's necessarily the

2    case.  Those are theories, those are arguments.  I don't want

3    to make it sound like they are weak arguments.  I do want to

4    make it sound like all of it is, as it presents to me, *Look,*

5    *here's our theory.  If you accept our theory, theirs is not*

6    *good enough*, and I think that's probably right.

7          The problem is, I don't think it's necessary or that

8    I -- the way to evaluate this is to say, *All right, starting*

9    *from the frame point of, here's our theory; is their evidence*

10   *sufficient*?  Nor do I think that it is proper for me to say,

11   *Starting from the standpoint of assuming their evidence is*

12   *sufficient, how do I consider what the defendant is saying*?

13         It's, I have been given a submission, I have been

14   given some general, oppositional arguments, with respect to the

15   existence of a conspiracy, and evaluating it and recognizing

16   that it is more global than focused, on the particular

17   statements, and it is more dependent upon the very broad

18   question of, is there a conspiracy, by a preponderance, given

19   what I have been given; the answer is yes; and that's all I'm

20   trying to say.

21         So it's not -- I don't want to belittle what you say.

22   I don't want to have the record reflect that you have responded

23   inappropriately, but you responded broadly, and because of that

24   response, I'm not really in a posture of going

25   statement-by-statement and going thumbs up, thumbs down, yes

1   no, yes, no, because it's basically the same response to

2   everything, and it all gets resolved by whether or not, given

3   the nature of the opposition or objection, it all gets resolved

4   by me deciding whether or not there's a preponderance --

5   whether, by a preponderance, the conspiracy existed, and I have

6   so found, so there you go.

7         *MS. MORGAN:*  Can I say one more thing?

8         *THE COURT:*  Yeah, of course.

9         *MS. MORGAN:*  So, you know, I guess when the -- Judge,

10   when you say, like, you don't necessarily believe that they

11   have to show that it's the same mail piece, I guess I'm looking

12   at that from the standpoint, if it's a scheme to defraud,

13   right?  If it's the, you know, the knowledge and intent to

14   devise a scheme to defraud, and that scheme then necessarily

15   has to be to obtain money and property, by means of material

16   false statements.  It seems to me, the false statement they're

17   saying that he received on his end, has to be the same false

18   statement that Mrs. Y got or Mrs. Z got or Suzie Q got; and

19   that's why I'm saying, like, there's a problem here, and that's

20   why there's a deficiency in the log, because they haven't --

21   they are just showing, here is a generically false statement.

22   Give us the false statement that relates to each of these

23   transactions, so we know.  So we can say what Mr. Lytle got and

24   what Mrs. Y got are the same thing.  Then we've made the

25   connection, somewhat.  There are still breaks, right, but if

1    the scheme to defraud is to obtain money, you have got to show

2    that they obtained money from the same fraudulent statement

3    that they are saying that he received and perpetuated, and that

4    they haven't done, and that's why we felt like a hearing should

5    be held, and so I just wanted to add that to my comments.

6         THE COURT:  All right.  That's fine.  All right.  You

7    want a piece of this?

8         MR. REYNOLDS:  Respectfully, sir, not necessarily,

9    Your Honor nothing to add.

10         THE COURT:  Not necessarily is neither a yes or no.

11    If you want to say something additional, go ahead and do it.

12         MR. REYNOLDS:  No, thank you.  Sir.

13         THE COURT:  All right.

14         MR. LEEDY:  I guess thinking all of this through, and

15    based on the Court's denial of the evidentiary hearing, I

16    request leave to file -- the opportunity to provide the Court

17    proffered evidence, not evidence that comes through a witness,

18    proffered evidence in the form of what we have that relates to

19    these --

20         THE COURT:  No.  I mean, look, this has been sitting

21    since ... June, and it's like, okay, this response didn't work

22    so I get to file another one?  No.

23         MR. LEEDY:  Well ... yes --

24         THE COURT:  I give you a standing objection during the

25    trial, but I'm not going to, you know, *Okay, here's the way we*

1  *go, this way.  Okay, that didn't work.  Let me approach this*

2  *from another direction.  Let me approach this from a third*

3  *direction.*  I'm not going to keep doing that.

4       *MR. LEEDY:*  It's in light of the Court's denial of the

5  hearing, I think --

6       *THE COURT:*  Why is that a surprise?  I told you on the

7  front end that's not the way I like to do things, and I was

8  demanding of them a *James* proffer.  If we were having a

9  hearing, I would have not asked for a *James* proffer.  I would

10  have had the witnesses tell me what it is that supposedly was

11  said.  I don't understand where the point of confusion comes

12  in.

13       *MR. LEEDY:*  The point of confusion is, procedurally,

14  it is different --

15       *THE COURT:*  And I told you how I do it.

16       *MR. LEEDY:*  I understand.  You said *your preference*.

17  You were thinking about not having a hearing.  You left open

18  the possibility for us to make argument, which you did today,

19  you denied that.  We have not had the opportunity to proffer

20  evidence to you.  It's just proffer, at this point.  We -- it's

21  not as though we didn't reply to the government's proffer; we

22  did, and in detail.  What's missing is our opportunity to

23  actually dig into evidentiary facts that the Court has decided

24  not to have a hearing about, which is fine.  But we would like

25  the opportunity to do that, and we would like the opportunity

1    to be, by written proffer, at this point, because the Court is

2    not inclined to hold a hearing.

3         THE COURT:  I will give you two weeks, and I will give

4    you two weeks to file a reply, but I'm telling you that from my

5    perspective, this notion of, *Oh, I don't know, this was all*

6    *about whether or not we were going to get a hearing, and not*

7    *about whether or not we had to sufficiently resist the James*

8    *proffer, that was being submitted, in light of a hearing, and*

9    *was said on its face that we don't need a hearing.*  No.  I'm

10   not going to do that.  I'm not ... I take that back.  We're

11   done.  You have your record.  You can -- you can take it up

12   with the Court of Appeals.  I will see you Friday.  Anything

13   further?

14        MR. REYNOLDS:  No.  Thank you, sir.

15        MS. MORGAN:  Um, do you mind if we just kind of talk

16   about, like, logistics or housekeeping?  Do you --

17        THE COURT:  Go ahead.

18        MS. MORGAN:  Since we're all together.

19        THE COURT:  Yeah.

20        MS. MORGAN:  So, one of the things that we were kind

21   of talking about, amongst ourselves and looking at the

22   scheduling order, and I --

23        THE COURT:  Hold on one second.

24        MS. MORGAN:  Our scheduling order, we addressed it 45

25   days for the 404(b) stuff, but what -- could we all be thinking

1    about, we don't need do it today, maybe we could have a

2    telephone conference among counsel and the Court, could we be

3    thinking about an earlier disclosure date?  I mean, there's no

4    disclosure date right now for exhibits and witness lists.

5    Could we be thinking about something 30 to 45 days in advance,

6    so that we, you know, again... super contested case, obviously.

7    It would be great if we could minimize those, sort of,

8    disruptions, to a jury; make sure the case goes as smoothly as

9    possible for the Court, for everybody and an earlier

10   disclosure, I think -- an earlier disclosure.  Let's identify a

11   disclosure date, and then figure out what -- so I'm just

12   throwing that out, since we're altogether.

13        *THE COURT:*  I tell you what, I tell you what, um ... I

14   have got a couple of trials that are coming up, and what I was

15   trying to do was -- in broad strokes, what I will tell you is

16   this, you and the government should talk to each other, and see

17   if you can come to an agreement, always, that's always the

18   simplest thing.  There's a degree to which I am inclined to say

19   that more advanced submission of materials may be helpful, but

20   I'm not so inclined to advance that by so much, that I'm making

21   it impossible for the government to comply or rushing their

22   decision making.  So ... let's do this, let's have a ... I'm

23   trying to see where I could have a meaningful hearing, because

24   I mean, if I push it off too far it's sort of pointless.

25        *MS. MORGAN:*  I was just going to say we're probably

1   going to have to come back and -- or maybe we could do it by

2   video conference, if there's a Superseding Indictment for an

3   arraignment, so maybe that would be the -- the time period that

4   we just tack on a few extra minutes.

5        THE COURT:  When you know what that date is, do me a

6   favor, contact Ms. Bader and I will try and see if I can carve

7   out some time for you to have a discussion then.

8        MS. MORGAN:  That would be super.  I appreciate it.

9   Thank you.

10        THE COURT:  Since you don't know when that date is, I

11   don't know when when that date is, but I mean, look, obviously,

12   I understand that you know two days before trial is not really

13   ... it's putting an enormous burden on the defendant.  I also

14   understand that saying 60 days in advance of trial is putting

15   enormous handcuff on the government.  I'm willing to do

16   something here, but the notion of, *Well, I have to do something*

17   *or else we're going to have all of these continuances*.  No.

18   The way I see it it is, maybe I have to do something and maybe

19   even ask me for a whole bunch of continuances, but that doesn't

20   mean I'm going to grant them.

21        MS. MORGAN:  Right.

22        THE COURT:  So we'll see -- talk to each other and

23   let's see what happens and let's just leave it at that.

24        MS. MORGAN:  Appreciate it.

25        THE COURT:  The table, the defense table, I will see

1  on Friday.  I don't know whether I'm seeing -- I lost track of

2  what the government is doing on Friday.

3          *MR. REYNOLDS:*  Your Honor, I think you issued a minute

4  order authorizing us to appear virtually.  So we will just do

5  that, if that's all right with Your Honor.

6          *THE COURT:*  No, no.  That's fine.  I just lost track

7  of it.  All right.  We will be in recess.

8          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

9      (Recess at 12:15 p.m.)

10                    REPORTER'S CERTIFICATE

11

12      I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

13

14      Dated at Denver, Colorado, this 7th day of December,

15  2022.

16                        s/Tammy Hoffschildt

17                        _____

18                        Tammy Hoffschildt, FCRR,RMR,CRR

19

20

21

22

23

24

25